IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| vs. | * | Case No. 1:21-cr-00028-APM-2 |
| | * | |
| **DONOVAN CROWL** | * | |
| **Defendant** | * | |
| | * | |

ooOoo

## DONOVAN CROWL'S MOTION FOR RECONSIDERATION OF DETENTION ORDER

Donoval Crowl, through his undersigned counsel, hereby respectfully moves this Honorable Court to review the Order of Detention entered by a Magistrate Judge and release Mr. Crowl on conditions that are satisfactory to the Court. To be clear, Mr. Crowl was not part of the throng of people that Americans watched on national television attacking police officers, breaking windows and doors at the United States Capitol or rifling through legislators desks on January 6, 2021.

He did not cause injury to anyone and did not destroy any property. On January 17, 2021, when Mr. Crowl learned that he was sought for questioning by federal authorities, he turned himself in to local police authorities in Ohio, his state of residence.

Mr. Crowl is not guilty of the charges filed against him, has pleaded not guilty, and is presumed innocent of the charges. He may be detained only if the Government establishes, by clear and convincing evidence, that he is a danger to the community under 18 U.S.C. § 3142(f)(1) or, by a preponderance of evidence, that he poses a serious risk of flight or obstruction under § 3142(f)(2). Under any standard, Mr. Crowl is not a serious risk of flight and he does not present a risk of danger to society, as more fully set forth below.

**FACTUAL BACKGROUND**

A.   **January 6, 2021**

Notwithstanding the rhetorical flourishes found in the Complaint and the Indictment filed against Mr. Crowl in this case, discovery produced by the Government shows that Mr. Crowl did not injure any person or possess any weapons at the United States Capitol on January 6, 2021. He did not possess or use mace or other irritants. He did not possess or use zip ties or other restraints. He did not damage, loot, or take away any property. During the short period that Mr. Crowl is alleged to have been inside the Capitol, he remained in the Capitol Rotunda and other public areas of the Capitol. Discovery and public source photographs and videos confirm these facts.

Mr. Crowl did not enter the Senate or House Chambers or any Congressional offices. He did not do anything to obstruct or impede any official proceeding, or attempt to do so. By the time he is alleged to have entered the Capitol at 2:40 p.m., the proceedings had been adjourned.

Mr. Crowl was in the District of Columbia on January 6, 2021, for reasons that are protected by the First Amendment and not for any illegal purpose. He was here to attend a political rally to be held near the White House in support of then-President Donald Trump. He did not come to DC to march to the Capitol or to illegally "stop, delay, and hinder Congress's certification of the Electoral College vote" as charged in Count One. His only purpose for coming to the District was to support then-President Trump and to provide private security.

The rally was a political event funded in part by the Trump presidential campaign.[1] For weeks, President Trump asked his supporters to come to the rally on that particular day. A march

---

[1] "Trump Campaign Paid $3.5 Million To 'Stop The Steal' Organizers, Report Finds" at https://www.forbes.com/sites/sarahhansen/2021/02/10/trump-campaign-paid-35-million-to-stop-the-steal-organizers-report-finds/?sh=1702a68437ae

to the Capitol was not in the plans announced to the public nor authorized by the permits granted by DC officials. President Trump and other nationally prominent former and present public officials, including former Mayor Rudy Giuliani (former Associate Attorney General of the United States and US Attorney for the Southern District of New York), Congressman Mo Brooks and other members of Congress, gave fiery speeches at that rally.[2]  At noon, President Trump explicitly asked his supporters to march to the Capitol:

> "We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated," Trump said at the outset of his comments. "I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard."
>
> Near the end of his speech, after many people had already begun walking toward the Capitol, he made the same pitch.
>
> "We're going to walk down Pennsylvania Avenue," he said, implying for the second time in his comments that he would go with them. " … And we're going to the Capitol, and we're going to try and give … our Republicans, the weak ones because the strong ones don't need any of our help. We're going to try and give them the kind of pride and boldness that they need to take back our country. So let's walk down Pennsylvania Avenue."[3]

---

[2] No doubt, the fiery speeches given by these prominent men at that provocatively named "Stop the Steal" rally whipped some in the crowd into a frenzy.  And President Trump explicitly asked the crowd to march to the Capitol to have their voices heard.  If that rally was held to draw persons to DC for the purpose of obstructing the count of the electoral college votes of the states, then one would expect that those prominent national officials would stand charged for their incitement of violence and as leaders and organizers or aiders and abettors in the conspiracy.

[3] Washington Post, 2/10/21, "When did the Jan. 6 rally become a march to the Capitol?" https://www.washingtonpost.com/politics/2021/02/10/when-did-jan-6-rally-become-march-capitol/

3

**B.     Factual Errors and Omissions**

**1.     No Plan to Corruptly Impede Congress' Certification**

While the Indictment alleges that from November 3, 2020, through January 6, 2021, Mr. Crowl conspired with others to "corruptly obstruct, influence and impede . . . Congress's certification of the Electoral College vote" (ECF 77 at ¶ 2), not a single text message or social media posting by Mr. Crowl indicates that he joined a conspiracy during those dates for that purpose or that he traveled to the District of Columbia to carry out such a plan.  As late as December 29, Mr. Crowl had no clue about traveling to DC on January 6.  On December 29, when Watkins tells Mr. Crowl that "we plan on going to DC on the 6th, weather permitting," he responds by asking "What's going on on the 6th?"  Several hours later, she responds by saying "DC. Trump wants all able bodied Patriots to come."  And a few minutes later, Ms. Watkins adds "If Trump activates the Insurrection Act, I'd hate to miss it."  Crowl Texts ## 458, 455, 451-50.  Mr. Crowl did not respond to that text message.

For what it's worth, however unlikely its invocation, the Insurrection Act grants the President the power to mobilize State militias and the Armed Forces:

> Whenever the President considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings, he may call into Federal service such of the militia of any State, and use such of the armed forces, as he considers necessary to enforce those laws or to suppress the rebellion.

10 U.S.C. § 252.  Accordingly, to the extent that the Insurrection Act was part of any discussion, by its terms, had Mr. Crowl in fact been called into service by the President's invocation of the Insurrection Act, his actions thereby would have been lawful.  As an honorably discharged Marine veteran, Mr. Crowl may be ordered back to active duty.  *See* 10 U.S.C. § 688.

### 2. Private Security for Roger Stone

In a series of text messages on January 1, 2021, Mr. Crowl is told by Ms. Watkins that it "looks like we might be security for Roger Stone, if we end up rolling with the Oathkeepers" and that it "Looks like we would be doing Private Security Details the whole time we're there." Crowl Texts ## 404-414. Later that same day, Mr. Crowl sends a text to another person: "Making plans for DC again for the 6th. Supposed to be security for Roger Stone. Leaving on Monday." Text #400. On January 3, Mr. Crowl texts a female with whom he has a romantic relationship "Packing my gear. Leaving for Virginia in the morning. Will be in DC Tuesday and Wednesday. Part of Roger Stone's Oathkeeper security detail. Should be fun." Text #374.

### 3. Manner and Means of Carrying out the Conspiracy

With respect to Mr. Crowl, the Indictment is plainly wrong when it alleges, among other things, that he carried out the conspiracy by

> Forcibly storming past exterior barricades, Capitol Police, and
> other law enforcement officers, and entering the Capitol complex
> in executing the January 6 operation

Indictment, ¶ 26(j). None of the discovery or public images available show Mr. Crowl doing any of these things. Moreover, in a telephone conversation with undersigned counsel, Government counsel stated that Mr. Crowl had not damaged any property or injured anyone. By email on March 12, Government counsel notified the Defense that "Capitol surveillance video footage as well as publicly available video footage suggests that the damage to the glass window panes on these doors was done prior to your clients' entry through the doors."

### 4. Training Camp in North Carolina

A number of the allegations in the Indictment are not accurate or omit material facts. For example, the Indictment states that "On December 12-13,2020, CROWL attended a training camp in North Carolina." Second Superseding Indictment ("the Indictment") (ECF 77), Overt Act 32. In fact, Mr. Crowl did not travel to North Carolina on those dates but remained in Ohio working on a customer's "water pump" and "doing work at the bar all week." Crowl Texts ## 819, 800, 780.

### 5. Ohio Regular Militia

While the Government has sought to paint the defendants, including Mr. Crowl as an anti-government insurrectionist, in fact Mr. Crowl is a veteran, who served his country honorably in the Persian Gulf as a mechanic. He is the fourth or fifth generation of his family to have served in our Armed Forces at times of war. He enlisted in the Marines when he was 17 years old and was honorably discharged after six years of service.

The Ohio Regular Militia was formed in 2019 for the purpose of offering aid in times of natural disaster. Indeed, on January 6, Mr. Crowl and others aided several persons who were hurt.

The Ohio Regular Militia is not anti-government but rather is a dedicated to helping others.

> **BACK THE BLUE**
> Ohio Regular Militia
> Ohio State Regulars
>
> I am the C.O. of the Ohio State Regular Militia. We are a group that is sworn to defend the Constitution. We are NOT anti-government. We do not allow any intolerance or extremism. We Back the Blue!

Watkins' Parler account.

With respect to the Oath Keepers, Mr. Crowl has no love loss for the group or its founder, Stewart Rhodes, known as "Stewie." When informed that they might work with the Oath Keepers

on private security for Roger Stone, the following exchange took place between Mr. Crowl and Ms. Watkins:

> Crowl: Lol. Ok. I wondered how long it would be before Stewey's [derogatory term] were in the mix." . . .
>
> Watkins: Stewie isn't coming. . . .
>
> Watkins: I'm down to be security for Roger Stone. Seems like a sweet gig.
>
> Crowl: I'm good with that. I just didn't wanna deal with Stewie.
>
> Watkins: Don't blame you at all. Looks like we would be doing Private Security Details the whole time we're there

Crowl Texts ## 409-413.

## THE LAW

## II. MR. CROWL DOES NOT FIT INTO THAT SMALL SUBSET OF "PARTICULARLY DANGEROUS DEFENDANTS" WHO MUST BE DETAINED PRETRIAL

The Supreme Court has recognized that Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are "the most serious" compared to other federal offenses. *United States v. Salerno*, 481 U.S. 739, 747 (1987). "This construction is consistent with the Senate Report, which states that pretrial detention is necessary for only a "small but identifiable group of particularly dangerous defendants." *See* S.Rep. No. 98-–225, at 6 (1984)." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir.1999).

As noted above and more fully set out below, it is clear that on January 6, 2021, Mr. Crowl did not use or threaten violence. He did not damage federal property or aid and abet anyone to do so. He did not cause injury to anyone. As the Government has conceded in a recent disclosure to

defendants that should be characterized as *Brady* discovery: "Capitol surveillance video footage as well as publicly available video footage suggests that the damage to the glass window panes on the[ ] doors [through which your clients entered the Capitol] was done prior to your clients' entry through the doors."[4]

## II. THE BAIL REFORM ACT DOES NOT AUTHORIZE DETENTION IN THIS CASE

> Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., a person awaiting trial on a federal offense may either be released on personal recognizance or bond, conditionally released, or detained. *See* 18 U.S.C. § 3142(a). The Act establishes procedures for each form of release, as well as for temporary and pretrial detention. Detention until trial is relatively difficult to impose. First, a judicial officer must find one of six circumstances triggering a detention hearing. *See* 18 U.S.C. § 3142(f). Absent one of these circumstances, detention is not an option.

*United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).

Section 3142(f)(1) describes a class of cases that permits pretrial detention including crimes of violence; sexual abuse cases; offenses where the maximum sentence is life or death; serious drug felonies; where the defendant is a serious recidivist; offenses involving child victims; and offenses listed in 18 U.S.C. 2332b(g)(5)(B) with a maximum sentence of ten years or more. Section 3142(f)(2) also allows pretrial detention in cases that involve a "serious" flight risk, or ones where there is a "serious" risk that defendant will "obstruct or attempt to obstruct justice."

In this case, the only offense which arguably authorizes detention and triggers a detention hearing under § 3142(f) is Count Three, which charges a violation of 18 U.S.C. § 1361, destruction of government property. However, if the damage or attempted damage to property in a § 1361 case

---

[4] Email from Government counsel to defense counsel on 3/12/21.

"does not exceed the sum of $1,000" then the maximum penalty under § 1361 is "imprisonment for not more than one year." Thus, if the property damage does not exceed $1000, the offense would not meet the second prong of § 3142(f)(1)(A).

Where as here the Government concedes that Mr. Crowl did not damage any government property, then it is not clear how § 3142(f)(1) can be satisfied. If the Government is relying on a theory of aiding and abetting to convict Mr. Crowl of the § 1361 offense, then the Court should require it to articulate its theory on this score. In other words, the Government should be required to state what actions Mr. Crowl took to bring about the destruction of property by the principal(s) and identify those principals. *See United States v. Raper*, 676 F.2d 841, 849 (D.C. Cir.1982) *citing United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.) (aider and abettor must "associate himself with the venture, ... participate in it as in something that he wishes to bring about, ... seek by his action to make it succeed").

If the Government is seeking detention under § 3142(f)(2) claiming that Mr. Crowl is a "serious" flight risk or that he will obstruct justice or threaten and injury a witness, that argument must fail as Mr. Crowl, unlike other defendants, did not destroy evidence or otherwise seek to obstruct justice. *Compare* Counts Five (tampering with documents); Six (same). And, when he learnt that he was wanted for questioning, Mr. Crowl did not flee but turned himself to his local police authorities in Ohio.

    **A.**    **Rebuttable Presumption Does Not Relieve Government of Its Burden**

The Bail Reform Act creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure ... the safety of the community if ... there is probable cause to believe that the person committed" one of an enumerated list of crimes in § 3142(f)(1), including

9

a crime carrying a maximum term of imprisonment of ten years and listed in 18 U.S.C. 2332b(g)(5)(B). Once triggered, "the presumption operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). "While the burden of production may not be heavy," *United States v. Lee*, 195 F.Supp.3d 120, 125 (D.D.C. 2016) (citations omitted), the defendant must proffer "at least some evidence" or basis to conclude that the case falls "outside 'the congressional paradigm' " giving rise to the presumption. *Stone*, 608 F.3d at 945–46 (quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985)). The defendant's burden, moreover, is only a burden of production; the burden of persuasion remains with the government throughout the proceeding. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *see also Alatishe*, 768 F.2d at 371 n.14.

Here, the lack of actual violence committed by Mr. Crowl or damage caused by him, his history and characteristics, his lack of leadership in the offense, and the fact that he turned himself in and did not destroy evidence, rebuts the presumption.

### III. THE BAIL REFORM ACT REQUIRES RELEASE ON THE LEAST RESTRICTIVE CONDITIONS UNLESS NO CONDITIONS WILL ASSURE DEFENDANT'S PRESENCE OR PROTECT PUBLIC

#### A. The Government Must Prove That an Arrestee Presents an Identified and Articulable Threat by Clear and Convincing Evidence

"Detention prior to trial or without trial is the carefully limited exception" to pretrial release. *United States v. Salerno,* 481 U.S. 739, 755 (1987). While the government has a legitimate interest in preventing crime by accused persons,

> [o]n the other side of the scale, of course, is the individual's strong interest in liberty. But, as our cases hold, this right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society. . . .When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee from executing that threat.

*Salerno,* 481 U.S. at 749-752.  Furthermore, "[o]ur system of criminal justice embraces a strong presumption against detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D. D. C. 2009).

The legislative history of the Bail Reform Act also expresses Congressional concern with strict prove before detaining a person pending trial:

> Because of the importance of the interests of the defendant which are implicated in a pretrial detention hearing, the committee has specifically provided that the facts on which the judicial officer bases a finding that no form of conditional release is adequate reasonably to assure the safety of any other person and the community, must be supported by clear and convincing evidence.  This provision emphasizes the requirement that there be an evidentiary basis for the facts that lead the judicial officer to conclude that a pretrial detention is necessary.

Committee Report to the Bail Reform Act, S. Rep. No. 225, 98th Cong., 1st Sess. 19 (1983), at 22, *reprinted in* 1984 U.S.Code Cong. & Admin.News, p. 3205.

Thus, the Bail Reform Act permits pretrial detention *only* if the Court finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure ... the safety of any other person and the community."  18 U.S.C. § 3142(e) and by preponderance that the defendant is a risk of flight.[5]  *United States v. Simpkins,* 826 F.2d 94, 96 (D.C. Cir.1987).

---

[5] Counsel does not believe that the Government sought detention to have Mr. Crowl detained when he appeared in the Southern District of Ohio on the basis that he presented a risk of flight.

### B.     Standard of Review – *De Novo*

If a defendant is ordered detained by a magistrate judge, the defendant may seek review of that release order by filing, with the Court having original jurisdiction over the offense, a motion to revoke the order or amend the conditions of release. 18 U.S.C. § 3145(b). This Court's review of the magistrate judge's order is "de novo" to determine whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). *See United States v. Weissberger,* 951 F.2d 392, 395 (D.C. Cir. 1991) (noting *de novo* review by district court); *United States v. Hudspeth*,143 F. Supp. 2d 32, 36 (D. D.C. 2001) (district court is "free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons").

### C.     Factors to Consider

In deciding whether to grant release, the Court must take into account: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community . 18 U.S.C. § 3142; *see United States v. Xulam,* 84 F.3d 441, 442 (D. C. Cir.1996) (per curiam).

#### 1.     Nature and Circumstances of the Offense Charged

Mr. Crowl is charged with one count of conspiracy, in violation of 18 U.S.C. § 371; obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361, 2; and entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a)-(b). Mr. Crowl's

alleged participation in each of these offenses does not support detention.

Except for Count 3 (18 U.S.C. § 1361), the destruction of government property, which arguably permits detention, pretrial detention is not authorized under any of the other offenses, no matter how much publicity the events of January 6, 2021 garnered. With respect to the conspiracy to corruptly obstruct, influence, and impede an official proceeding, that is, Congress's certification of the Electoral College vote, there is simply no evidence that Mr. Crowl came to the District of Columbia for that purpose or conspired with others to do so.

Moreover, at all times on January 6, 2021, Mr. Crowl acted peacefully. By the time he entered the Capitol, sometime around 2:40 p.m., the proceedings before Congress had been suspended. Other persons, not associated with Mr. Crowl, had torn down barricades, broken windows and forced entry into the Capitol.

Mr. Crowl did not use or possess a firearm or other weapon. He did not use or possess mace or other irritants. He did not have zip ties or any similar items on him. He did not injure or threaten injure to any person. Indeed, he assisted at least three people who needed help either in the Capitol or in the area surrounding the Capitol.

He did not damage any property. He did not enter the Senate or House chambers, nor any Congressional offices. He did not rifle through private papers of elected officials or their staffs. He did not take away any Government property. He did not aid or encourage others to damage or otherwise depredate any property.

All his interactions with law enforcement were friendly. At approximately 4:45 p.m., Metropolitan Police Officers who encountered him and three other defendants from Ohio walking around 14th Street N.W., he consented to being searched. No weapons were found during the search.

He did not plan or direct others in planning the trip to the District of Columbia. He did not plan to come to DC to interfere with the counting of votes by Congress. His purpose for coming to DC was to support a political rally and provide security services.

Moreover, the § 1752(a)-(b) entering a restricted building offense is a misdemeanor unless the Government can show that "the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm". 18 U.S.C. § 1752(b)(1)(A). Mr. Crowl did not carry or use a dangerous weapon. Or, unless the Government can show that "the offense results in significant bodily injury as defined by section 2118(e)(3)." 18 U.S.C. § 1752(b)(1)(A). Again, with the Government's concession that Mr. Crowl did not injure anyone, the maximum penalty of this offense is one year imprisonment.

### 2.     Weight of the Evidence Against the Defendant

The evidence that he conspired to obstruct and that he obstructed an official proceeding is weak. Despite the multitude of open source images and discovery obtained by the Government for the defendants' phones and social media posts, there is no evidence that Mr. Crowl conspired with others to come to DC to disrupt the Congressional proceedings, damage the Capitol, or cause injury to any person. There is scant evidence that he obstructed an official proceeding as by the time he allegedly entered the Capitol at approximately 2:40 p.m., the proceedings had already been adjourned as a result of the actions of others.

As the Government has conceded, Mr. Crowl did not injure or attempt to injure anyone. He did not damage or attempt to damage any property. Significantly, the § 1361 offense requires proof that Mr. Crowl "willfully" injured or destroyed property. The willfulness element further weakens the evidence against Mr. Crowl, as the damage to the door which he allegedly entered had already

been done when he allegedly entered the Capitol.

Moreover, the evidence that he entered and remained in a restricted building or grounds is weak as he allegedly remained in public areas of the Capitol at all times and there is no evidence that the East entrance to the Capitol, which he allegedly used to enter the Capitol, was locked or otherwise posted as restricted to the public when he allegedly entered.

    **3.**    **History and Characteristics of the Defendant**

As a 17-year old, Mr. Crowl enlisted in the United States Marine Corps. He served his country honorably from 1987 until he was honorably discharged in 1994. While a Marine, he served in a combat zone in the Persian Gulf for a period time. Every generation in his family has served in our country's armed forces during every war fought by America. His father was a Marine who served in Vietnam. His uncle also served in Vietnam. His grandfathers served in World War II. His great grandfather fought in World War I.

For more than 10 years, he coached pee wee baseball and football for his son's and step son's teams in Ohio. He continued coaching even after his sons stopped playing. The young men he coached loved him.

When Mr. Crowl's son was 12 years old, he and his wife separated and he raised his son by himself until the young man became an adult and struck out on his own. During part of that time, the child's mother went through a rough spot and lost all contact with the child.

His son, who is now 23 years old, works on a dairy farm in Ohio. He describes his father as a "very good person" who would "take the shirt off his back" to help anyone. He spoke lovingly of the years his father spent coaching pee wee league ball for teams he and his half-brother played on.

He describes his father as a person who has a good influence on people and is good with kids.

He says that his father helped me through tough years after his mother left.

An acquaintance of Mr. Crowl's interviewed by CNN said of him that when drunk, Crowl is "a man you want to shut up. When sober, the best man you could have."

Mr. Crowl is a carpenter. He is self- employed.

Finally, Mr. Crowl was diagnosed with melanoma several years ago. He is not receiving adequate treatment in pretrial detention. Melanoma is a cancer, which if left untreated can spread with a deadly result. This reason alone merits granting Mr. Crowl pretrial detention so that he can seek continued treatment at a Veterans Administration Hospital.

    **4.**    **Nature and Seriousness of the Danger to Any Person or the Community**

Finally, the fourth factor, the nature and seriousness of any danger to the community, strongly favors release. As set out in the Superseding Indictment returned by the Grand Jury, the Complaint out by an FBI agent, and the discovery produced by prosecutors, Mr. Crowl did not, on January 6, 2021 or at any other time, injure anyone, destroy property or incite or encourage anyone else to do so. To the contrary, he helped extricate persons from the Capitol, who had been injured. He did the same thing while outside the Capitol.

Similarly, Mr. Crowl's interactions with law enforcement were friendly and helpful. At no time did he disobey any lawful orders. And, when stopped by MPD Officers while walking the District of Columbia just before 5 pm on January 6, he consented to a search. Significantly, at that time, he did not have any firearms or weapons with him. Indeed, Mr. Crowl did not bring any firearms or weapons into the Capitol, into the District of Columbia or to the hotel in Virginia where he stayed overnight.

He did not force entry into the Capitol. By the time, he entered the Capitol, the Capitol had

been breached by others and the proceedings had been adjourned. When his home was searched, authorities found no dangerous weapons.

### IV. CONDITIONS OF RELEASE

The Pretrial Services Officer in Ohio recommended that high intensity supervision would assure Mr. Crowl's presence at future hearings and prevent any risk of danger to the community. That recommendation still holds true. Indeed, with the additional disclosures made by the Government that Mr. Crowl did not injure any person or cause any damage, there is no question that high intensity supervision is appropriate in this case. Mr. Crowl may live with his son in Ohio. May receive the necessary medical treatment. And will be able to return to Ohio as required by the Court. He also has relatives in Virginia where he may stay if he needs to come back to court on a regular basis.

### CONCLUSION

For all these reasons, and any that may become apparent at a hearing on this matter, Mr. Crowl respectfully submits that the Government has failed to meet its burden by clear and convincing evidence that he presents a risk of danger to society and by a preponderance of the evidence that he is a risk of flight. Wherefor, he respectfully requests that this Honorable Court release him on high intensity supervision.

Respectfully submitted,

/s/ *Carmen D. Hernandez*
**Carmen D. Hernandez**
Bar No. MD 03366
7166 Mink Hollow Rd
Highland, MD 20777

240-472-3391
chernan7@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that the instant notice was served on all counsel of record 18th day of March, 2021 on all counsel of record via ECF.

/s/ *Carmen D. Hernandez*
**Carmen D. Hernandez**