**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 21-CR-28 (APM)** |
| | **:** | |
| **DONOVAN CROWL,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| _____ | **:** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION**
**FOR RECONSIDERATION OF DETENTION ORDER**

The United States respectfully files this opposition to the defendant's Motion For Reconsideration of Detention Order. (ECF 92). For the reasons stated below, the defendant should remain detained pending trial.

**ARGUMENT**

On January 19, 2021, Defendant Donovan Crowl was arrested on a complaint charging him with conspiracy, in violation of 18 U.S.C. § 371; conspiracy to impede or injure an officer, in violation of 18 U.S.C. § 372; destruction of government property, in violation of 18 U.S.C. § 1361; obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a); and violent entry on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2). On January 22, 2021, Magistrate Judge Sharon Ovington of the Southern District of Ohio found by clear and convincing evidence that no condition or combination of conditions set forth in 18 U.S.C. § 3142(c) would reasonably assure the appearance of the defendant as required and the safety of the community. *United States v. Donavan Crowl*, No. 3:21-MJ-24, (J. Ovington, January 16, 2021). Despite the evidence against

the defendant now being stronger than at the initial detention hearing, the defendant requests that the Court reconsider the 18 U.S.C. § 3142(g) factors.

A Grand Jury has now indicted the defendant by finding probable cause for numerous charges including 18 U.S.C. § 1361, an enumerated offense under 18 U.S.C § 2332(b)(g)(5)(B) and § 3156(a)(4)(A) from which the presumption of detention arises. As outlined below, the factors under 18 U.S.C. § 3142(g) favor detention now more than ever. The defendant remains a danger and flight risk.

<u>**Background**</u>

The indictment alleges that on January 6, 2021, Defendant Crowl, while wearing battle gear that included military-style fatigues, a helmet, goggles, and a protective vest, joined a line of similarly attired individuals who moved in a disciplined and coordinated fashion up and through the crowd that had gathered on the central staircase on the east side of the U.S. Capitol.  A screenshot of video footage of the group is below, with a portion of the "stack" encircled by a red oval, with pictured Defendant Crowl at the bottom of the oval:



At approximately 2:40 p.m., this "stack" forcibly entered the Capitol. The incursion into the Capitol by Defendant Crowl's group and hundreds of others caused a temporary halt to the Joint Session of the U.S. Congress that had gathered to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.

Many of the individuals in Defendant Crowl's group, including Defendant Crowl, wore patches and clothing with logos and insignia of an organization known as the "Oath Keepers." A close-up view of the badges on the vest of one of these individuals, seen just under the Oath Keepers emblem on his shirt, displays the Oath Keepers motto, "Not On Our Watch." The badge also says, "I don't believe in anything.  I'm just here for the violence."



The Oath Keepers are a large but loosely organized collection of individuals, some of whom are associated with militias. (ECF 77 at 4). The Oath Keepers are led by PERSON ONE. On January 4, 2021, PERSON ONE posted an article to the Oath Keepers website encouraging Oath Keeper members and affiliates to go to Washington, D.C., for the events of January 5-6, 2021, stating:

> "It is CRITICAL that all patriots who can be in D.C. get to D.C. to stand tall in support of President Trump's fight to defeat the enemies foreign and domestic who are attempting a coup, through the massive vote fraud and related attacks on our Republic. We Oath Keepers are both honor-bound and eager to be there in strength to do our part."

Evidence gathered to date suggests that Crowl was a "vetted" affiliate of the Oath Keepers. On November 11, 2020, co-defendant Jessica Watkins wrote to a fellow member of the Oath Keepers, "Hey [Oath Keeper Member], you still do vetting for OK's? I have one of my militia guys coming to D.C. that needs to be vetted in order to participate[.] . . . [PERSON ONE] is allowing non-members who have been vetted to participate in D.C. in order to maximize patriot participance[.]"  Later that evening, the other Oath Keeper member forwarded to Watkins a message he had sent to PERSON ONE in which he stated, "Good evening sir Jess from Ohio reached out to me to vett Donovan Crowl from Ohio . . . ."  A little while later, the other Oath

Keeper member wrote back to Watkins to say, "[PERSON ONE] said good to go vetted in tell my new brother welcome[.]"

Several days later, Defendant Crowl traveled with co-Defendant Watkins to the Washington, D.C. area and participated with PERSON ONE and other members of the Oath Keepers in an event colloquially referred to as the "Million MAGA March."  Co-defendant Watkins and Defendant Crowl met co-defendant Thomas Caldwell on this trip and stayed at his residence in Virginia for the event. For the events of November 14, 2020, PERSON ONE organized a "QRF," or "Quick Reaction Force," which, in his words, consisted of "our most skilled special warfare veterans standing by armed, just outside D.C., as an emergency QRF in the event of a worst case scenario in D.C. (such as a 'Benghazi' style assault on the White House by communist terrorists, in conjunction with stand-down orders by traitor generals)."[1]

Beginning in late December 2020, the defendant coordinated Washington, D.C. travel plans with co-defendants Watkins, Caldwell and others for an "Oathkeeper Op." (ECF 77 at 8-10). These discussions included the transportation of guns, referred to as "heavies," across state lines, and night "hunting," an apparent reference to attacking members of the group Antifa. (ECF 77 at 12-13). Specifically, on January 2, 2021, co-defendant Caldwell sent Defendant Crowl a Facebook message informing him that PERSON THREE, who would be staying at the same hotel as Defendant Crowl, and co-defendants Caldwell and Watkins, "will be the quick reaction force" and "will have the goodies in case things go bad and we need to get heavy." Defendant Crowl responded a few hours later, "Thanks for all the info Sir. Jess and I got a room at your same motel. We are enroute . . . .  Be good to see your mug tomorrow Sir."

Further Facebook messages show that the defendant was not just a follower, but also a

---

[1] https://web.archive.org/web/20201112040027/https://oathkeepers.org/2020/11/call-to-action-march-on-dc-stop-the-steal-defend-the-president-defeat-the-deep-state/

leader. For example, in the days leading up to January 6, Defendant Crowl responded to multiple requests from a third party on how to get involved:

**Author** ▭
**Sent** 2021-01-04 19:06:11 UTC
**Body** Hey brother. Any news on anything? I've got a couple guys on the line, and I'm not sure what to tell them

**Author** Donovan Crowl (Facebook: 100003473512615)
**Sent** 2021-01-04 21:32:25 UTC
**Body** I do. Sorry Brother, been busy planning for this week. Lemme give you a holler later tonight. We are enroute to DC right now for a few days on an Oathkeepers Op.

**Author** ▭
**Sent** 2021-01-05 21:57:07 UTC
**Body** Hey brother.
▭
(▭ ▭
Motivated marine. Like minded. Great dude. Please look out for him. He's in Virginia now and doesn't know where to go or what to do. Please do me a solid and take him in? He's one of us and will be back here too! SFMF. and thanks!

**Author** Donovan Crowl (Facebook: 100003473512615)
**Sent** 2021-01-05 23:36:48 UTC
**Body** Roger that. Calling him now.

Similarly, on the evening of January 5, 2021, Defendant Crowl sent a text message stating, "[T]his is Donovan with Oathkeepers in D.C.. Give me a holler." A few hours later, he messaged the same individual, "Hey Brother, the whole convoy is leaving from here in the morning at 530. We are getting up at 5. If you Uber over we'll reimburse your fare." Defendant Crowl later sent this person the address where he and several of his co-defendants were staying.

Further, the defendant demonstrated inside knowledge about the presence of covert Oath Keeper members in rival political organizations. On January 5, 2021, the defendant had the

following social media exchange:

**Author**
**Sent** 2021-01-06 03:02:23 UTC
**Body** One more thing. Keep eyes on people with Red MAGA hats worn
backwards. Saw a report that they were going to infiltrate crowd
tomorrow

**Author** Donovan Crowl (Facebook: 100003473512615)
**Sent** 2021-01-06 03:08:16 UTC
**Body** Thanks Brother, but we are WAY ahead on that. We have
infiltrators in Their ranks. We are doing the W.H. in the am and
early afternoon, rest up at the Hotel, then headed back out
tomorrow night "tifa" hunt'in. We expect good hunting.

In short, the defendant was not only an affiliate of an organization that called for a halt to the peaceful transition of power, but he was a leader. The defendant's plans included violence. The defendant planned to "hunt" enemies upon his arrival in Washington, D.C. and was ready for violence.

On January 6, when violence at the Capitol broke out, the defendant moved into action with his co-conspirators. Several members of the conspiracy – including co-defendant Watkins, with whom the defendant traveled to D.C. and to whom the defendant referred as his "captain" – participated in a Signal chat titled "D.C. OP: Jan 6 21." The chat shows that the participants were activating a plan to use force on January 6. At approximately 1:38 p.m., PERSON ONE wrote, "All I see is Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." At 2:14 p.m., an individual leading the coordination of the security details run by the Oath Keepers on January 5-6 stated, "The have taken ground at the capital[.] We need to regroup any members who are not on mission." PERSON ONE then reposted that message and instructed the group: "Come to South Side of Capitol on

7

steps" and then sent a photograph showing the southeast side of the Capitol.  At 2:41 p.m., PERSON ONE posted another photograph showing the southeast side of the Capitol with the caption, "South side of US Capitol.  Patriots pounding on doors[.]" At approximately 2:40 p.m., the conspirators, including Defendant Crowl, forcibly entered the Capitol in stack formation through the Rotunda door in the center of the east side of the building.

In the minutes directly prior to Defendant Crowl's breach of the Capitol, hundreds of rioters surrounded and assaulted law enforcement officers who were attempting to prohibit entry at the East doors. Video captures the officers in the terrifying final minutes before the breach occurs, as they try to stop the rioters.[2] The collective mob pushes forward with a common goal yelling "Take their shields," "Drag 'em out," "Our house," and "We want Trump!" The rioters fire pepper spray at the officers (which strikes the Capitol doors), beat the officers with shields and flagpoles, and fire numerous projectiles at the officers and the doors. When the rioters at large, including the defendant, eventually gain entry a woman shouts "We did it," as alarm bells blare. Publicly available photographs then show the defendant in his Oath Keeper uniform inside the capitol:

---

[2] https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec (Oath Keeper stack visible at 4:10)





Once inside, video shows various Oath Keepers continuing their assault and yelling "Push"

as they try to surge past another line of police officers.[3] Co-defendant Watkins characterized their insurgent effort to breach the Capitol building as "forcing entry into the Capitol building" and said that it was "[f]orced. Like Rugby."  On the afternoon and evening of January 6, co-defendant Graydon Young (Defendant Steele's brother) wrote on Facebook that "[w]e stormed and got inside," and co-defendant Kelly Meggs wrote in a Signal chat, "Ok who gives a damn who went in there…. We are now the enemy of the State."  An hour later, co-defendant Kelly Meggs wrote to the same Signal chat: "We aren't quitting!!  We are reloading!!"

Although law enforcement was able to re-gain control of the building and Congress did in fact certify the Electoral College vote during the evening of January 6, this was not the end for the defendant, as he bragged about his participation in the conspiracy and plotted his next move. In Facebook messages, the defendant said:

> **Author** Donovan Crowl (Facebook: 100003473512615)
> **Sent** 2021-01-07 03:18:26 UTC
> **Body** Yes...we went in through the east "back" door. Just as they broke through the front door. I'll have to tell you about it...It....was...EPIC!!!
>
> **Author** [                                    ]
> **Sent** 2021-01-07 03:18:58 UTC
> **Body** I can imagine ... been all over the news.
>
> **Author** Donovan Crowl (Facebook: 100003473512615)
> **Sent** 2021-01-07 03:19:44 UTC
> **Body** Hope they got the message.  The Storm has arrived.

The defendant and his co-defendant Watkins (identified as "Jolly Roger" in the exchange below) shared their intent to continue the conspiracy to prevent the peaceful transition of power and take up armed rebellion through messages sent on January 11:

---

[3] https://twitter.com/i/status/1373031864961802246; https://twitter.com/i/status/1373032386720636928

**Author** Donovan Crowl (Facebook: 100003473512615)
   **Sent** 2021-01-11 21:28:27 UTC
   **Body** I'm with you Cap. Keep the faith.  We will have our answers by the
       20th.

**Author** Jolly Roger (Facebook: 100031277182387)
   **Sent** 2021-01-11 21:29:08 UTC
   **Body** Aye aye. That we will. We've been organizing a bugout plan if the
       usurper is installed.

**Author** Donovan Crowl (Facebook: 100003473512615)
   **Sent** 2021-01-11 21:29:26 UTC
   **Body** Great idea.

**Author** Jolly Roger (Facebook: 100031277182387)
   **Sent** 2021-01-11 21:31:05 UTC
   **Body** Something like 20+ Oathkeepers going to Kentucky mountains on
       hundreds of acres apparently. Solar power, clean mountain spring,
       the whole 9. About 2 hours south of         place, which is
       convenient.

**Author** Donovan Crowl (Facebook: 100003473512615)
   **Sent** 2021-01-11 21:31:31 UTC
   **Body** Hell yeah.

**Author** Jolly Roger (Facebook: 100031277182387)
   **Sent** 2021-01-11 21:32:19 UTC
   **Body** They are leaving Illinois. They said the state would be one of the
       first overrun, and most heavily controlled.

**Author** Donovan Crowl (Facebook: 100003473512615)
   **Sent** 2021-01-11 21:32:36 UTC
   **Body** True story

**Author** Jolly Roger (Facebook: 100031277182387)
   **Sent** 2021-01-11 21:32:52 UTC
   **Body** Kentucky seems solid af

**Author** Donovan Crowl (Facebook: 100003473512615)
   **Sent** 2021-01-11 21:33:42 UTC
   **Body** Ozarks as well. Far less people.

**Author** Jolly Roger (Facebook: 100031277182387)
   **Sent** 2021-01-11 21:33:58 UTC
   **Body** Tons of tree cover too they said. Good defense against pesky drone
       surviellance

**Author** Jolly Roger (Facebook: 100031277182387)
   **Sent** 2021-01-11 21:35:08 UTC
   **Body** [_____]'s place. Good dude. He's up a mountain.

**Author** Donovan Crowl (Facebook: 100003473512615)
   **Sent** 2021-01-11 21:35:39 UTC
   **Body** Right on.

**Author** Jolly Roger (Facebook: 100031277182387)
   **Sent** 2021-01-11 21:36:39 UTC
   **Body** Gives us the high ground, and makes tunneling out fighting positions great (above water line). Be like the NVA and network tunnels.

**Author** Donovan Crowl (Facebook: 100003473512615)
   **Sent** 2021-01-11 21:38:40 UTC
   **Body** We should probably discuss all this in person.  I'll be up after I get paid tomorrow.


Ultimately, prior to his arrest, it appears that Defendant Crowl traveled with co-defendant Watkins to the home of co-defendant Caldwell. Co-defendant Caldwell invited Defendant Crowl and co-defendant Watkins to stash their "battle rattle" at his home, but Defendant Crowl had already ditched the protective vest he wore that day – a vest with the identifying nickname of "Trapper" – at the home of an acquaintance (law enforcement recovered the vest during a search of that acquaintance's premises). As they traveled to co-defendant Caldwell's residence, the defendants remained intent on evading detection and protecting the conspiracy.  Co-defendant Caldwell instructed Defendant Crowl,

| 84 | Inbox | From<br><br>Tom Commander *<br><br>Direction:<br>Incoming | Time:<br>1/14/2021<br>12:35:07<br>PM(UTC-5) | + | Read | Source:<br>Phone | No need to call me again. Will expect you even if you are running late.  Don't forget to double back an exit or two at least twice to make sure not followed<br>**Source Extraction:**<br>Advanced Logical |

| 85 | Inbox | From<br>+<br>Tom Commander *<br><br>Direction:<br>Incoming | Time:<br>1/14/2021<br>12:33:12<br>PM(UTC-5) | + | Read | Source:<br>Phone | We will expect you. Bring full battle rattle to stash here if you want.<br>**Source Extraction:**<br>Advanced Logical |

### **Legal Standard**

The defendant seeks review of Magistrate Judge Ovington's detention order by filing a motion to revoke the order or amend the conditions of release. 18 U.S.C. § 3145(b). This Court's review of the magistrate judge's order is "de novo" to determine whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). At a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

## Argument

Every factor under 18 U.S.C. § 3142(g) points to the necessity of the defendant's continued detention. He is both a danger and a risk of flight. Since the defendant planned to travel to D.C. to cause violence, moved throughout the Capitol in a coordinated military maneuver, and planned to continue the conspiracy after the riots, he should be held.

**A) No Condition or Combination of Conditions Can Reasonably Assure the Safety of the Community.**

1) **Nature and Circumstances of the Offense Charged Warrant Detention.**

The defendant and his confederates stormed the United States Capitol on January 6, 2021. Dressed in tactical gear, the defendant forced his way inside the Capitol building. That unprecedented takeover halted Congress's vote to certify the electoral college results, placed in jeopardy the lives of members of Congress and those law enforcement officers assigned to protect them, and resulted in damage to the Capitol building. The nature and circumstances of the defendant's offenses, in short, were among the most serious imaginable.

Among the crimes with which the defendant has been indicted is 18 U.S.C. § 1361. Section 1361, which prohibits willfully injuring or committing depredations against government property, carries particular significance for purposes of detention for two reasons. First, as committed here, it amounts to a federal crime of terrorism. *See* 18 U.S.C.A. § 2332b (Defining Crime of Terrorism an offense "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"). The peaceful transfer of power is the foundation of American democracy. Defendant Crowl halted, if only temporarily, this process by storming the Capitol during the certification of the Electoral College vote. One segment of the Defendant's terroristic actions on January 6 was the destruction of the doors to the Capitol, through

which he gained entry. [4]

Second, Section 1361 is a crime of violence. Under § 3156(a)(4)(A), a "crime of violence" is "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." Video from the riot shows that the East Capitol doors were destroyed via individuals smashing windows, throwing projectiles, and spraying chemical irritants, among other means. The destruction of these doors through violence is, therefore, a crime of violence. *See Johnson v. United States*, 559 U.S. 133, 140 (2010) (holding that "in the context of a statutory definition of 'violent felony,' the phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person.").

This Court should order that the defendant remain held pending trial for his brazen and unapologetic participation in offenses that are among "the more threatening to our way of life." *United States v. Eric Munchel*, No. 1:21-cr-00118, (J. Lamberth, February 17, 2021). "The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law." *United States v. William Chrestman*, No. 1:21-mj-00218, (C.J. Howell, February 26, 2021). Chief Judge Howell recently enumerated factors she considered when evaluating government requests for pre-trial detention, which included:

- "Any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear, suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process"
- "Evidence of coordination with other participants before, during, or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol"
- "words and movements during the riot reflect[ing] the egregiousness of his conduct."

---

[4] The court need not consider the valuation question under 18 U.S.C. § 1361 at this stage in the proceedings. The nature and circumstances of the offense in 3142(g)(1) refer to a Federal crime of terrorism, which, under 2332b(g)(1)(B), doesn't distinguish between misdemeanor and felony violations of 1361.

*Id.* At 15-16.

Based on the factors laid out by Chief Judge Howell, the nature and circumstances of the offense favor detention. The defendant traveled to Washington, D.C. as part of a call to arms, planned to hunt his enemies while there, dressed in tactical gear on the day of the riots, and then conspired with other Oath Keepers to breach the Capitol.

The defendant makes several claims in his motion that are wholly inconsistent with both the defendant's words and actions. For example, the defendant's claims that "His only purpose for coming to the District was to support then-President Trump and to provide private security." (ECF 92 at 14). Not so. At referenced above, at a minimum, the defendant came to D.C. to "hunt" and therefore terrorize his perceived enemies. He was also aware that other members of the conspiracy were bringing weapons to the area to serve as a "quick reaction force" to support his and his co-conspirators' mission. In other words, well before January 6, the defendant readily heeded PERSON ONE's "call to arms" and expressed a willingness to cause violence and mayhem in support of his group's goals.

The defendant wholly minimizes his conduct by claiming that he "did not damage any property" and that "other persons, not associated with Mr. Crowl, had torn down barricades, broken windows and forced entry into the Capitol." (ECF 92 at 13). While others may have breached the first perimeter of law enforcement by assaulting officers and overturning barricades, the defendant was only able to advance toward the Capitol due to their efforts. While others may have been the first to smash the windows to the doors of the Capitol and begin the process of gaining entry by destroying its doors, the defendant was only able to advance toward the threshold of the Capitol due to their efforts. While others may have pushed officers out of the way at the threshold of the door, the defendant gained entry to the Capitol only because of their efforts. The

defendant was able to accomplish his intent due to the violence of others. This hardly immunizes him from criminal liability.

More to the point, publicly available video from outside the east side Rotunda entrance shows that shortly before 2:40 p.m., Defendant Crowl's group was immediately behind the front line of the mob, supporting them as they attacked the officers guarding the doors, launched projectiles at the officers and the doors, fired pepper spray at the officers (which appeared to strike the doors), and ultimately forced the doors open. The struggle to open the doors involved violent yanking. Moments later, Defendant Crowl and his group surged forward with the crowd and forcibly entered the Capitol. The doors suffered significant damage during this assault, including not only broken glass windowpanes, but also a broken handle and a broken door closer arm (likely the result of the violent yanking on the door), and damage from substances that could have been caused by the pepper spray fired by the crowd. Each of these discrete categories of damage to the door has cost or will cost more than $1,000 to repair, according to a representative of the Architect of the Capitol.[5]

### 2) The Weight of the Evidence Against the Defendant Favors Detention.

The evidence against the defendant also weighs in favor of detention. It is undisputed that the defendant (i) traveled to D.C. (in the defendant's own words) to "hunt," (ii) was part of an organization whose leader called the democratic proceedings a "coup," (iii) dressed in full combat gear on the day of the Electoral College certification, (iii) breached the Capitol in a military formation while Congress was attempting to certify the Electoral College vote, and (iv) then strategized about taking up armed rebellion following the restoration of order at the Capitol. Even

---

[5] The United States Capitol suffered additional damage, as well, in areas where members of the conspiracy were active. Once inside the Rotunda, various Oath Keepers attempted to push through an additional line of officers who were guarding access to the Senate. In response to the attack, police officers deployed pepper spray. The Rotunda, including its artwork, has required extensive restoration as a result.

on the evidentiary issues that the defendant does claim are in dispute, his claims fail.

### a)  The Defendant Intended to Obstruct the Congressional Proceedings.

As evidenced by his attire during the Capitol riots, the defendant was a vetted affiliate of the Oath Keepers, a militia organization whose leader, prior to January 6, was actively calling on the President to invoke the Insurrection Act, as part of an effort to prevent a democratic transfer of power.  On January 6, during the congressional proceeding to certify the Electoral College vote—the results of which the defendant wrongly believed to be fraudulent—the defendant and his co-conspirators joined together in military formation and breached the Capitol building along with hundreds of rioters. Upon entering the Capitol, the defendant joined with his co-conspirators in attempting to push past a police line guarding a hallway leading down the Senate side of the building. The defendant also celebrated with co-defendant Watkins. In a Parler video compiled by ProPublica,[6] co-defendant Watkins and Defendant Crowl are shown together in the Capitol Rotunda.  Defendant Crowl says, "We took on the Capitol!  We overran the Capitol!"  Co-defendant Watkins exclaims, "We're in the fucking Capitol, [unintelligible]!" Co-defendant Watkins and Defendant Crowl turn the camera around for a video selfie to document the moment:

---

[6] https://projects.propublica.org/parler-capitol-videos/ (last accessed January 19, 2021).



The defendant's intent to disrupt the proceedings can easily, therefore, be inferred through both his actions and words prior to and during the riots of January 6.[7] In short, the defendant was prepared for violence with his co-conspirators and, when the opportunity arose, seized the initiative to disrupt the transfer of power by breaching the Capitol as Congress attempted to certify the election.

### b) The Defendant Aided and Abetted in the Destruction of the Capitol.

The East doors to the Capitol suffered thousands of dollars' worth of damage due to broken windowpanes, broken door handles, broken door arms, liquid and substance staining and graffiti. The damage was caused by hundreds of rioters attempting to open the doors and violently enter

---

[7] As a secondary argument, the defendant also claims that he could not have obstructed the official proceeding since Congress had already been adjourned by the time he breached the Capitol. This argument strains reality for obvious reasons. Congress could not reconvene to certify the electoral college vote with organized militias and rioters engaged in violent confrontations with law enforcement inside the Capitol.

the Capitol. The defendant and the "stack" gained entry to those doors and aided and abetted in their destruction.

While aiding and abetting liability requires the aider-abettor to form an intent to facilitate the commission of the crime by a principal, the law does not require a perfectly shared-intent. *United States v. Moore*, 651 F.3d 30, 91 (D.C. Cir. 2011) (requiring "proof of some shared intent" but not a perfect overlap). Here, the common design of the rioters directly outside the East doors was to gain entry through those doors and to obstruct the proceedings within. "[O]nce a common design is established, the aider and abettor is responsible not only for the success of the common design, but also for the probable and natural consequences that flow from its execution, even if those consequences were not originally intended." *United States v. Walker*, 99 F.3d 439, 443 (D.C. Cir. 1996); *see also United States v. Davis*, 828 F. Supp. 2d 405, 409 (D. Mass. 2011), *aff'd*, 717 F.3d 28 (1st Cir. 2013) ("It takes no great leap of imagination to recognize that the 'probable and natural consequences' doctrine of aiding and abetting, which holds an accomplice responsible for all foreseeable criminal acts flowing from the common scheme (a form of *Pinkerton* liability), a doctrine recognized in all Circuits (although not always consistently applied), would be defeated by any definition of aiding and abetting that required the accomplice to have perfect knowledge of the details of the crimes the principal intended to commit.") (citing *Walker*, *supra*). The destruction of the Capitol doors was a natural and probable consequence of the rioters' intent on disrupting the proceedings within, especially given that the group of rioters that the defendant and his co-conspirators joined began their attack by aggressively gathering around and berating the officers who were guarding the door to let them in.

The defendant claims that he had no part in aiding and abetting the destruction of the doors, because he did not throw a projectile and because the doors had already suffered damage when he

20

entered. The government wholly acknowledges that the destruction of the doors began approximately 20 minutes earlier, but, as evidence in the video referenced in footnote 2 demonstrates, the rioters continued to cause damage to the doors up to and including the very minute that the defendant breached them. Under such a circumstance, it is irrelevant whether the defendant, as opposed to a rioter standing next to him, personally hurled a projectile or sprayed an irritant at the East door. Defendant Crowl and his co-conspirators joined the crowd of rioters at the East door, physically supported them with their presence as they attacked the doors and the officers guarding them, and acted with the same collective intent to force their way inside. Under these circumstances, the ensuing destruction of the doors was a natural consequence of the conduct that the defendant aided and abetted.

### c) The Defendant Knew He was Entering a Restricted Area When He Breached the Capitol.

Video evidence quickly dispels the defendant's claim that "there is no evidence that the East entrance to the Capitol, which he allegedly used to enter the Capitol, was locked or otherwise posted as restricted to the public when he allegedly entered." (ECF 92 at 15). In the moments immediately preceding the breach by the defendant, rioters violently assaulted officers standing guard at the doors, including beating them with Trump flagpoles. They shouted, "Get their shield," "Move!" "Drag 'em out!" Officers attempted to dodge the rioters' projectiles and pepper spray. The windows of the Capitol door were smashed. The defendant, in stack formation with his co-defendants, weaved to the front of the crowd. Upon entry to the Capitol, alarm bells rang loudly signally the breach. No reasonable individual could have any expectation that he had a lawful right to be present.

3) **The Defendant's History and Characteristics Also Favor Detention Because the**

**Defendant's Recent Participation in Storming the US Capitol is More Relevant Than His History of Past Service.**

The defendant points to his past military service and that he once coached youth sports to support his release. These arguments should not sway the Court.

Nothing in the record suggests that he has any remorse about the events of January 6 or has disclaimed the beliefs and his actions on that day, and thus there is no evidentiary basis to assume that defendant will refrain from similar activities, if instructed, in the future. In the days immediately following the riots, the defendant bragged about his criminal conduct and described it as "epic." Importantly he stated, "The Storm has arrived." The defendant's reference to "The "Storm" should gravely concern the Court as this is a common QAnon concept. Central to the QAnon conspiracy theory is the false belief of the existence of a secret cabal of Satan-worshipping pedophiles and child-traffickers. The "Storm" refers to a day of violence that will result in mass arrests, military trials, and executions of the members of the cabal. According to QAnon lore, "the Storm", will be followed by the "Great Awakening," which generally refers to the belief that the truth of the central tenets of QAnon will be revealed to the world. The defendant's ongoing belief and actions on behalf of a wholly unfounded conspiracy theory speaks to his dangerousness and calls into question whether the defendant would comply with any conditions of release.

4) **The Defendant is an Ongoing Danger.**

The defendant's actions on January 6, as well as his statements and actions following the riot, show that he is an ongoing danger. The Court should put little weight on any peaceful interaction the defendant had with officers on the evening of January 6. (ECF 92 at 16). At the time, law enforcement was regrouping after being overrun by the rioters and the defendant was not a suspect or wanted for arrest. The defendant would have no reason to flee from law

enforcement at that time, and flight would have only aroused suspicion. His actions are consistent with any still anonymous subject fleeing a crime scene who wanted to evade detection.

The danger that the defendant presents is best demonstrated in his private conversations following January 6. As referenced above, the defendant and co-defendant Watkins referenced receiving potential material support from other Oath Keepers not currently charged in the conspiracy. This conversation included Defendant Crowl and co-defendant Watkins, colluding with others, to wage a guerilla war against the United States, and imitating the strategies of the "NVA," also known as the Army of North Vietnam. The NVA killed thousands of American soldiers in guerilla warfare from the 1950s through the 1970s. The defendant needs to be taken at his own word. He continues to pose a danger to the United States and its citizens, now more than ever since the transfer of power has been completed.

**B) The Defendant Poses a Flight Risk.**

Finally, detention is necessary because the defendant's release poses a serious risk of flight under 18 U.S.C. § 3142(f)(2). As noted above, in the days after January 6, the defendant discussed with co-defendant Watkins seeking shelter with sympathetic Oath Keepers who had lodging in the mountains. In addition, prior to his arrest, Defendant Crowl ditched an identifying piece of his battle gear at the home of an acquaintance and traveled to the home of co-defendant Caldwell who directed him not to communicate over the phone and to double back on the highway to avoid being followed. The defendant is a sophisticated individual with a demonstrated ability to take measures to avoid detection and is likely to have the support of his fellow militia member's in any potential flight.

## CONCLUSION

There are no conditions or combination of conditions that will reasonably assure the safety of the community or the defendant's submission to this Court's authority. The defendant's actions are uniquely threatening to our democratic way of life. This Court should thus deny the defendant's motion for release.


Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


_____/s/_____
LOUIS MANZO
Special Assistant United States Attorney
Mass Bar # 688337
Kathryn L. Rakoczy
Jeffrey S. Nestler
Troy A. Edwards, Jr.
Ahmed Baset
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530


_____
Justin Sher
Alexandra Hughes
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2021, I sent a copy of the foregoing via the Court's electronic filing system to Carmen Hernandez, Esq., counsel for the defendant.


/s/
LOUIS MANZO
Special Assistant United States Attorney