## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DONOVAN CROWL<br><br>Defendant. | )<br>)<br>)<br>)<br>)  Case No. 1:21-cr-0028-2 (APM)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT CROWL'S NOTICE OF NEW AUTHORITY
## IN *U.S. v. SANDLIN*, AND *U.S. v. REFFITT*,

Defendant Crowl, through his counsel, notifies the Court that Judge Friedrich has denied a January 6 defendant's motion to dismiss a charge under 18 U.S.C. § 1512(c)(2), *U.S. v. Ronald Sandlin*, 2021 WL 5865006 (D.D.C. 2021)[1], while at the same time deferring consideration of another under the vagueness doctrine. *U.S. v. Guy Reffitt*, Case No. 21-cr-32-DLF (D.D.C. 2021)[2]. Mr. Crowl submits this Memorandum to bring to the Court's attention his objections to the reasoning set out in each of those opinions and note its errors. Mr. Crowl also submits that, in any event, the decisions do not apply to his case. While the Sandlin decision addresses the "official proceeding" challenge first, Mr. Crowl first addresses the vagueness challenge as that has been the principal argument he has made in his motions and related memoranda.[3]

### A.      The First Amendment and the Background of the January 6 Events

*Sandlin* begins its analysis by noting the "background" allegations in the Indictment relating to the joint session of Congress that was convened to certify the Electoral College results

---

[1]  Case No 21-cr-88-DLF (D.D.C. Dec. 11, 2021 (Doc 63).

[2]  Minute Order, 12/11/21.

[3]  *See, e.g.,* US v. Crowl, No. 21-cr-0028, (ECF 288, 400, 455).

of the 2020 Presidential Election and noting that some persons "in the crowd forced their way over police barricades and into the Capitol by breaking windows, ramming doors, and assaulting Capitol police officers," *Sandlin*, 2021 WL 5865006, at *1.  It further relates that Sandlin and his codefendant both carried knives with them into the Capitol , "wrestled officers in order to get inside" the Senate Chamber," Sandlin "struck one of the officers in the back of the head" and both defendants shouted to others to "take laptops, paperwork, take everything."  *Id.* at *1-2.

Significantly, Mr. Crowl's Indictment does not allege that on January 6, he broke any windows, rammed any doors, carried any weapons, or assaulted any Capitol police officers or other law enforcement officers, as Sandlin and his codefendant are alleged to have done.[4]  To the extent that *Sandlin's* analysis and holding interprets §1512(c)(2) by reference to what it terms the "independently criminal conduct" charged against Sandlin and his codefendant. *id.* at *12-13, that analysis cannot hold against Mr. Crowl.   Indeed, as the Supreme Court made clear in reversing a conviction for flag burning, the First Amendment protects expressive conduct of the kind alleged against Mr. Crowl.  *See, e.g., Texas v.Johnson,* 491 U.S. 397 (1989):

> The First Amendment literally forbids the abridgment only of "speech," but we have long recognized that its protection does not end at the spoken or written word. While we have rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea, we have acknowledged that conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.
>
> In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." Hence, we have recognized the expressive nature of students' wearing of black armbands to protest American military

---

[4]  See, e.g.,  *US v Crowl,* Sixth Superseding Indictment (ECF 513)

> involvement in Vietnam; of a sit-in by blacks in a "whites only" area to protest segregation; of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam; and of picketing about a wide variety of causes.

*Texas v. Johnson*, 491 U.S. at 404 (internal citations omitted).   The *Johnson* Court also discounted allegations that others in the crowd of political demonstrators, but not defendant Johnson, had engaged in acts of civil disturbance and vandalism.  *Id.* at 399

Moreover, as the Supreme Court made clear, the protection that the First Amendment affords to expressive conduct and political demonstrations does not affect the ability of a state to prosecute breaches of the peace under specific statutory provisions that do not implicate the First Amendment.  *Id.* at 410.  Thus, there is no need to interpret §1512 in a novel manner to reach conduct that has nothing to do with the integrity of evidence and consequently has never been prosecuted under obstruction statutes.  When a person assaults a police officer within the Capitol or commits some other offense, he can be charged with a violation of 18 U.S.C. § 111 or some other appropriate statute, without stretching the meaning on 18 U.S.C. 1512(c)(2), in a manner that would violate Mr. Crowl's due process to fair notice of what the law prohibits and to the enforcement of the criminal law in a manner that is not arbitrary or discriminatory, or that would require this Court to legislate from the bench, or infringe First Amendment rights.

Yet, *Sandlin* mentions the First Amendment only once in passing without addressing whether the defendant's protest activity on January 6 was protected by the First Amendment or the First Amendment implications of stretching the obstruction statutes in a novel manner beyond any application in 100 years of obstruction prosecutions.[5]   As he has argued, Mr. Crowl's activities on January 6 included political expression, assembly and petitioning of the

---

[5]  *See Sandlin* at *12

government for a redress of grievances. U.S. Const. amend. I. Insofar as the § 1512(c)(2) charges characterize protest per se as obstruction of congressional proceedings, they are unconstitutional applications of the statute as applied to him. To prevail on an as-applied challenge under the First Amendment, Mr. Crowl must merely show that § 1512(c)(2) is being unconstitutionally applied as to the specific protected activity for which he is charged. *Edwards v.Dist. of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014).  The first question is whether Mr. Crowl's  alleged conduct was "expressive." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). "[T]o bring the First Amendment into play," Mr. Crowl must merely show "[a]n intent to convey a particularized message was present" and "the likelihood . . . that the message would be understood by those who viewed it." *Id.* Next, the court assesses whether the challenged statute is related in any way to the suppression of free expression. If so, and if the law is content-neutral, the court must subject the statute to intermediate scrutiny. *Edwards*, 755 F.3d at 1002. Under that standard, the statute is constitutionally applied only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged irst Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).  Here, it is clear that the conduct charged under § 1512(c)(2) was protected expression. The entire thrust of the Indictment, the § 1512(c)(2) offense and the misdemeanor counts is that Mr. Crowl and others protested at the Capitol concerning the results of the 2020 presidential election. That is the very core of the First Amendment. *See*, *e.g.*, *Johnson*, 491 U.S. at 404, *supra.*

Similarly, there can be no argument that § 1512(c)(2)'s application here is unrelated to the suppression of expression, assembly and the petitioning of the government for a redress of

grievances.  Again, the thrust of the obstruction and other counts is that Mr. Crowl .and his codefendants intended to affect the actions of Congress: otherwise known as political demonstration and protest.  Critically, the Indictment's obstruction theory encompasses the very act of protesting to affect congressional action itself.  Accordingly, § 1512(c)(2) is here "related to the suppression of free expression." *See*, *e.g.*, *United States v. Caputo*, 201 F. Supp. 3d 65, 71 D.D.C. 2016) (restricted area statute "related to the suppression of free expression" where charged defendant jumped White House fence to protest executive action).  Accordingly, under an intermediate scrutiny test, the Court applies the *O'Brien* factors to determine the constitutionality of § 1512(c)(2)'s application here.  The following two factors show that the statute's application here is patently unconstitutional: (1) the government's interest *is* related to the suppression of free expression; and (2) the incidental restriction on First Amendment freedoms *is* greater than is essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377.

Particularly if the *Sandlin* decision is applied to Mr. Crowl, the § 1512(c)(2) charges in his case are not limited to an attempt to influence Congress by threats or force and can only mean that it covers acts that influence Congress through protest and demonstration. Accordingly, the §1512(c)(2) charges against Mr. Crowl unconstitutionally infringe on his First Amendment rights and should be dismissed.

### B.     Section 1512(c)(2) Is Limited To Acts Affecting Evidence

The *Sandlin* Court acknowledged that the subsections of § 1512 "surrounding" subsection (c)(2) "focus on documentary, tangible, and testimonial evidence."   *Id*. at *5.  However, the Court determined that subsection (c)(2), uniquely, "is not limited to acts affecting evidence." *Id.*

The Court did not identify any other subsection in § 1512—titled, "Tampering with a

witness, victim or informant"[6]—that is similarly unbound by any relationship to evidence in a proceeding.  But the actus reus verbs in (c)(2)—"obstruct," "influence," and "impede"—are "expansive and seemingly encompass all sorts of actions that affect or interfere with official proceedings, including . . . halting the occurrence of the proceeding altogether." *Id.* at *7.

The *Sandlin* Court acknowledged that it must consider "the broader context of the statute as a whole." *Id.* at 9.  It began with subsection (c)(1).  The Court acknowledged that (c)(1) is indeed "limited to acts affecting evidence," namely, altering, destroying or concealing documents and other objects "with the intent to impair the object's integrity or availability for use in an official proceeding." *Id.*  It also acknowledged that "Subsections (c)(1) and (c)(2) are linked by the word 'otherwise,'" resulting in "interplay between" the subsections.  *Id.*

However, one page after concluding that (c)(1) and (c)(2) are "linked," the Court determined they are, simultaneously, "plainly separate and independent." *Id.* at *6.  The Court did not explain how things can be linked and separate at the same time.  But it did find that (c)(2) was "independent" from (c)(1) because it is "set off by both a semicolon and a line break." *Id.* Yet the judicial purpose of interpreting statutory text is to understand its meaning, as distinguished from its visual appearance as such.  And the Court did not explain how a semicolon and line break somehow altered the meaning of (c)(2)'s "otherwise" phrase which, as the Court correctly noted, "links" it to the meaning of (c)(1).  As Mr. Crowl has previously explained, the question of meaning involves grammar, not page format.  Subsection (c)(2) is a clause dependent on (c)(1) for its meaning because the predicate "or otherwise obstructs, influences, or impedes any official proceeding, or attempts to. . . ." is not a complete sentence. That distinguishes the relationship between (c)(1) and (c)(2) from the relationship between the

---

[6] The *Sandlin* Court prefers the pre-codification title of the "relevant section in [the SOX legislation]. . ." Mem. Op., p. 13.

two statutory sections in the case relied on by the *Sandlin* Court, *Overdevest Nurseries*, *L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021).  For convenience, Crowl reproduces here the two sections that the *Sandlin* Court compares to (c)(1) and (c)(2) of § 1512:

> To participate in the H-2A program, an employer must first certify to the Secretary of Labor that:
>
> > **A.** there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, ["subsection A"] and
> >
> > **B.** the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed ["subsection B"].

*Overdevest Nurseries*, *L.P.* , 2 F.4th at 983 (quoting 8 U.S.C. § 1188(a)(1)(A)-(B)).

As the Court will see, each of the provisions in the case relied on by the *Sandlin* Court is a complete sentence, unlike subsections (c)(1) and (c)(2) of § 1512.  Thus, they are grammatically independent in a way that (c)(1) and (c)(2) are not.  The same grammatical point distinguishes Justice Scalia's finding in *United States v. Aguilar*, on which the *Sandlin* Court relies, that the *ejusdem generis* canon did not apply to § 1503's "omnibus clause."  515 U.S. at 615-16 (finding that the omnibus clause is "independent" of the rest of § 1503 in a grammatical sense: it stands alone as a complete sentence).

Contrary to the *Sandlin* Court's understanding, line breaks and semicolons do not necessarily alter the meaning of the clauses that follow in a sentence.  Section (c)(2)'s "; or otherwise obstructs . . ." cannot be understood without reference to (c)(1)

The *Sandlin* Court's mistake in paradoxically finding (c)(2) "linked" to, but "independent" of, (c)(1) led it to erroneously distinguish *Begay v. United States*, 553 U.S. 137 (2008).  *Sandlin¸* at *6-7.  As in *Begay*, the "otherwise" clause in (c)(2) following (c)(1)'s "alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document or other object . . . with

7

the intent to impair the object's integrity or availability for use in an official proceeding. . ." must only cover "similar" crimes. 574 U.S. at 142. If (c)(2) reaches acts as unrelated to object evidence destruction as entering the United States Capitol without permission, it covers activities such as trespass or harassment. Those crimes are no more "similar" to the document destruction in (c)(1) than the DUI offense was to violent crime in *Begay*. The way in which the *Sandlin* Court distinguished *Begay* was to incorrectly find (c)(2) "independent of" (but "linked to") (c)(1). *Id*.

The *Sandlin* Court's treatment of *Yates v. United States*, 574 U.S. 528 (2015) contained similar errors concerning application of the *noscitur a sociis* canon (a word is known by the company it keeps) and the avoidance of surplusage. Consider *noscitur a sociis* first. The *Sandlin* Court found that *Yates* "was troubled by the fact that some of the provision's verbs—like 'falsifies' and 'makes a false entry in'—would not make sense as applied to fish." *Sandlin* at *7. But, the Court added, that "is not a problem [in connection with January 6 and § 1512(c)(2)], where obstructing, influencing, or impeding an official proceeding naturally come in numerous forms, including both evidence impairment and the halting of the proceeding altogether." *Id.*

*Yates*'s reasoning under *noscitur a sociis* was more comprehensive than the isolated point cited by the *Sandlin* Court. *Yates* found that "tangible object" in § 1519 was "in the company of" terms relating to "record[s] [or] document[s.]" 574 U.S. at 544. "Tangible object," therefore, was "appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects . . . used to record or preserve information." *Id.* The Court was also "[m]indful that in Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception and cover ups." *Id.* at 532. Reading "tangible object" to cover objects like a fish that did not record or preserve information would "cut § 1519 loose from its financial-fraud mooring." *Id.* It is not

enough, the Court held, to simply contend that § 1519 "extends beyond the principal evil motivating its passage" and that the statute is a "general ban on the spoliation of evidence" going by dictionary definitions of "tangible" and "object" in isolation. *Id.* at 536.[7]

The government's argument that § 1512(c)(2) is the only provision in the statute that criminalizes acts unrelated to evidence integrity and availability is significantly more offensive to *noscitur a sociis* than the government's interpretation in *Yates*.  As the *Sandlin* Court itself allowed, the subsections of § 1512 "surrounding" subsection (c)(2) "focus on documentary, tangible, and testimonial evidence." *Sandlin,* at *8.  Just as in *Yates*, those § 1512 provisions all concern "information" destined for a proceeding.  Allowing (c)(2) to cover acts having no relationship to information in a proceeding would, like applying "tangible object" to a fish, "cut § [1512(c)(2)] loose from its financial-fraud mooring" and from the rest of the statutory scheme. *Yates*, 574 U.S. at 532.  The government's error in *Yates* is in the same nature as its error here: it applies an obstruction of justice concept in the wrong category.

The *Sandlin* Court's surplusage analysis was also mistaken.  *Sandlin,* at *8.  The Court determined that the government's construction of (c)(2)—criminalizing any act that obstructs/influences an official proceeding—"does not entirely subsume numerous provisions within the chapter." *Id.*  That is incorrect.  The government's interpretation plainly swallows the rest of § 1512 as well as §§ 1503 and 1505.

The *Sandlin* Court determined that "§ 1512(a)(1)(C), (a)(2)(C), (b)(3), and (d)(2)–(4) proscribe conduct unrelated to an 'official proceeding'" and thus that surplusage is avoided. *Sandlin,* at *8.  Notice, first, that the Court implicitly acknowledged that the government's construction of (c)(2) renders useless §§ 1512(a)(1)(A), 1512(a)(1)(B), 1512(a)(2)(A), and

---

[7] The *Sandlin* Court's holding directly conflicts with this part of *Yates*: "Statutes often reach beyond the principal evil that animated them." *Sandlin,* at *9.

1512(a)(2)(B).  But the Court is incorrect that the sub-sub-sections it emphasizes are "unrelated to an 'official proceeding'" and thus that the government's interpretation of (c)(2) does not render them superfluous.  When a person kills (§ 1512(a)(1)(C)), or uses physical force (§ 1512(a)(2)(C)) on, or threatens (§ 1512(b)(3)) someone to "prevent [their] communication . . .to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense. . .," this is not unconnected to an official proceeding.  For "an official proceeding need not be pending or about to be instituted at the time of the offense." § 1512(f)(1).  The nexus element merely requires that obstruction of a specifically contemplated official proceeding, even if not then instituted, be the intended outcome of the obstructive act.  Therefore, if a defendant assaults a person to prevent their communication to law enforcement of the time and location of a particular drug transaction, the nexus requirement to a specific but not-yet-instituted official proceeding may be satisfied.  Thus, the government's interpretation of (c)(2) has not avoided surplusage in §§ 1512(a)(1)(C), 1512(a)(2)(C), and 1512(b)(3).

The Court's surplusage mistake extends to § (d)(2)–(4).  Harassment designed to prevent a person from reporting to law enforcement or a judge ((d)(2)), from arresting a person "in connection with a federal offense" ((d)(3)), or from "causing a criminal prosecution . . . to be sought or instituted" ((d)(4)) is very much conduct related to an official proceeding, because, again: official proceedings "need not be pending or about to be instituted at the time of the offense," § 1512(f)(1), and all of those actus reus contemplate official proceedings.

The Court says the government's construction of (c)(2) creates no surplusage of §§ 1503 and 1505 because those latter statutes "prohibit obstructive acts related to the 'due administration of justice' and congressional inquiries or investigations, respectively, which may have no

relation to an official proceeding." *Sandlin,* at *8.  Not so.  As explained above, every circuit that has defined the "due administration of justice" has held that its meaning is coterminous with judicial proceedings.  Judicial proceedings are also "official proceedings." § 1515(a)(1)(A).  As for congressional inquiries or investigations, if, as the *Sandlin* Court believes, an "official proceeding" is merely any formal proceeding, congressional inquiries or investigations would qualify by definition.

The *Sandlin* Court cites the counter-canon that, sometimes, forbidden surplusage is merely tolerable "overlap."  *Sandlin,* at *8.  But while the Court cites a dissenting rather than a controlling opinion in support, it omits that in the past six years the Supreme Court has rejected the "mere overlap" counter-canon in the context of "catchall" provisions in obstruction statutes -- precisely the scenario here.  *Marinello v. United States*, 138 S. Ct. 1101, 1107-08 (2018); *Yates*, 574 U.S. at 544.

"More important" than the "mere overlap" counter-canon, added the *Sandlin* Court, was that defendants' construction of subsection (c)(2), "which would limit its scope to acts affecting evidence, would also[8] overlap with the rest of § 1512."  *Sandlin,* at *8 . The Court suggests that defendant's arguments are flawed because "committing an act that affects evidence in a proceeding fully encompasses 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object' for its use in a proceeding," too.  Here the Court conflates the defendants' argument against the government's overbroad construction (it even reaches conduct unrelated to evidence) with the defendants' positive construction of (c)(2).

Defendants do not argue that (c)(2) covers "any act concerning the impairment or availability of evidence."  Instead, they contend that (c)(2) criminalizes "obstruct[ing],

---

[8] Notice the "also." The *Sandlin* Court impliedly admits that the government's interpretation of § 1512(c)(2) engulfs "the rest of § 1512."

influenc[ing], or imped[ing] any official proceeding" by "impair[ing] [evidence's] integrity or availability for use in an official proceeding" in a manner other than "detroy[ing], mutilate[ing], or conceal[ing] a record, document or other object. . ." § 1512(c)(1).  Examples would include interfering with non-object evidence, such as occurs in all the § 1512(c)(2) cases on which the *Sandlin* Court relies.  *Sandlin,* at *7-8.

Finally, the *Sandlin* Court cites to a case which "affirmed a § 1512(c)(2) conviction where the defendant's obstructive conduct did not relate to evidence." *Sandlin,* at *9 (citing *United States v. Reich*, 479 F.3d 179 (2d Cir. 2007)).   The Court's reliance on *Reich* is misplaced.  For one thing, the obstructive conduct did "relate to evidence." The defendant faxed a fake court order to his litigation opponent in a civil case—to prevent the court from considering a motion for summary judgment.   479 F.3d at 182.   By definition, motions for summary judgment involve a review of evidence.  Fed. R. Civ. P. 56(a).  Second, the defendant did not even argue that, and the court of appeals did not consider whether, § 1512(c)(2) only covers acts related to evidence impairment or availability.  *Id.*

### C.    The *Sandlin* Court's Analysis Of The Vagueness Doctrine, The Rule Of Lenity And The Novel Construction Principle Is Wrong

*Sandlin* determined that, although no court before January 6 had applied a Chapter 73 statute outside the context of adjudicatory proceedings and investigations, and although no court had applied § 1512(c)(2) to acts unrelated to evidence, the vagueness doctrine and the rule of lenity did not prevent the Court from placing those new constructions on the statute and applying them to conduct that occurred before the interpretations had been decided.  *Sandlin,* at *9-10.  Its analysis of those doctrines was misguided.

*Sandlin* reasoned that § 1512(c)(2)'s "verbs plainly cover obstructive acts aimed at official proceedings." *Id.* at *9.   However, the question was not whether the verbs cover

obstructive acts generally but obstructive acts unrelated to evidence impairment or availability--like every other part of § 1512.  Because no court had ever held so, it is hard to see how a reasonably intelligent person would have notice that (c)(2) "plainly cover[s]," for example, entering the United States Capitol without permission.[9]  Moreover, *Sandlin* did not address how or why a reasonably intelligent person would be on notice that a Chapter 73 obstruction statute would be applied to a "proceeding" not involving an investigation, evidence, or adjudication.  Indeed, over a century of obstruction of justice jurisprudence would put such a person on notice that the joint session of Congress on January 6 was not a Chapter 73 "proceeding" because it did not involve an investigation, evidence, or adjudication.

*Sandlin* adds, "there is little question that violent assaults on law enforcement officers of the nature charged here constitute obstructive acts. The defendants were on notice of the illegality of their alleged conduct." *Id.*  If the issue were whether defendants were on notice that assault would be prosecuted, the *Sandlin* Court would be quite right.  However, the question instead is whether Mr. Crowl was on notice of a different crime, obstruction of justice under § 1512(c)(2).  "Violent assaults," while plainly deplorable, do not have some intrinsic connection to the meaning of "proceeding" or whether all of § 1512's sections concern evidence impairment or availability.  *Sandlin* addressed a straw man argument made by the government.

*Sandlin* briefly addressed the arbitrariness component of vagueness doctrine as follows. "'Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge

---

[9]  While Mr. Crowl does not admit that he in fact kowningly entered the United States Captiol without permission, for purposes of this memorandum he acknowledges that the Indictment thus so allege.

shall be made, or whether to dismiss a proceeding once brought.'" *Id.* at *9 (quoting *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016)).

That analysis of the significant evidence of arbitrariness inherent in the government's use of § 1512 in the January 6 cases is unfortunately insufficient.  It is also mistaken.  Over 100 times the government has entered into Class B misdemeanor plea agreements with defendants whose conduct is identical to that of defendants charged under § 1512 who are facing up to 20 years in prison.[10]  The government has ventured no explanation whatsoever to distinguish why a person falls into the misdemeanor category versus the serious felony one.  No fair and impartial court system can respond to this enormous problem with drastic consequences for people's lives by citing one highly generalized statement about judicial review.  Nor has the government adequately explained how the hundreds (or thousands) of other protests at the Capitol before January 6 never justified a 20-year felony prosecution under § 1512(c)(2).  Fortunately, vagueness doctrine does indeed address the situation where a vague interpretation of a criminal statute enables arbitrary and discriminatory enforcement.

As Justice Gorsuch recently explained, vagueness doctrine, which is rooted in the due process clause of the Fifth Amendment, is applied specifically to prevent "the exercise of arbitrary power." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring).  For vague laws "leav[e] people in the dark about what the law demands and allow[] prosecutors and courts to make it up." *Id.*

The *Fokker Servs. B.V.* decision, relied on by the *Sandlin* Court, does not hold otherwise.  That case did not concern vagueness doctrine.  The government and defendant entered into a deferred prosecution agreement and filed a motion to toll the Speedy Trial Act to make it work.

---

[10]  *See, e.g.,* Chart attached as misdemeanor prosecutions attached as Exhibit 1.

818 F.3d at 737.  The district court denied the motion on the ground that it was unhappy with deferred prosecution and would hold out on the Speedy Trial Act until it got the charges it wanted.  *Id.*  The D.C. Circuit reversed, holding that courts do not have the power to hold a Speedy Trial Act motion hostage on such grounds.  *Id.*  This uncontroversial and quite easy decision has nothing to say about the scope of vagueness doctrine.

Here, by contrast, the point is not that the Court should direct the government which charges to file.  The perspective, rather, is that of a reasonably intelligent defendant.  If the government is charging hundreds of people with a Class B misdemeanor for the same conduct that randomly results in a felony charge punishable by 20 years of prison time, the issue is whether the crimes are sufficiently demarcated to put a defendant on notice of his dramatically increased criminal liability.  In these cases, the government has provided no notice, much less fair notice, of when or why a defendant moves from a Title 40 offense to a § 1512 charge.[11]  This is a gross absence of "standards to govern the actions of police officers, prosecutors, juries and judges," *Dimaya*, 138 S. Ct. at 1212, which cannot be effectively resolved by citations to generalized principles outside the relevant constitutional doctrine.

Finally, the *Sandlin* Court addressed the rule of lenity in two sentences.  *Sandlin,* at *10.  Although no court before *Sandlin* had applied § 1512(c)(2) to proceedings not involving

---

[11]  The fact that Mr. Crowl may have worn an Oath Keepers insignia and khaki or olive green shirt and pants cannot be the basis for the distinction.  *See, e.g., Texas v. Johnson*, 491 U.S. at 404 ("In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Spence v. State of Washington,* 418 U.S. 405, 410–411 (1974)  Hence, we have recognized the expressive nature of students' wearing of black armbands to protest American military involvement in Vietnam, *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 505 (1969) [and] of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam, *Schacht v. United States,* 398 U.S. 58 (1970).").

adjudication or investigations and to acts unrelated to evidence, and although multiple courts in the district have acknowledged that the issues are challenging and difficult, the *Sandlin* Court found no "grievous ambiguity." *Id.* (citing *Barber v. Thomas*, 560 U.S. 474, 488 (2010)). This was in error. In the first place, in the *Yates* decision the Court applied an "any doubt" standard of ambiguity, not the "grievous ambiguity" standard. 574 U.S. at 548 ("[I]f our recourse to traditional tools of statutory construction *leaves any doubt* about the meaning of 'tangible object,' . . . we would invoke the rule [of lenity].") (emphasis added). *Yates* postdates *Barber*. *See also Abramski v. United States*, 573 U.S. 169, 204 (2014) (Scalia, J., dissenting) ("[C]ontrary to the miserly [grievous ambiguity] approach, the rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, a reasonable doubt persists regarding whether Congress has made the defendant's conduct a federal crime.") (cleaned up). Here, as explained, courts have already expressed "doubt" about the government's novel construction of § 1512(c)(2). In any case, even if the "grievous" ambiguity standard were correct, it would have to apply here. If the rule of lenity does not apply to multiple novel and strained interpretations piled on top of each other that leave lawyers and courts in the dark after hundreds of pages of briefing, lenity would never apply. In addition, although the *Sandlin* Court cites to *United States v. Lanier*, 520 U.S. 259 (1997), it did not address that decision's novel construction principle. Even if the government's interpretations of § 1512(c)(2) were somehow unambiguously correct and not void-for-vagueness, they still concededly lack any supporting precedent. It is a violation of the due process clause to apply them retroactively to conduct that occurred before any court had adopted those understandings of the statute. *Lanier*, 520 U.S. at 266 (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964)).

### D.        Corruptly Is Unconstitutionally Vague Under Poindexter

*Sandlin* began its analysis of § 1512(c)(2)'s term "corruptly" by treating the defendants' arguments as though they were merely a facial challenge to that term.  *Sandlin,* at *10-11.  They are not.  Mr. Crowl argues that (1) as a matter of statutory construction, "corruptly" does not mean "wrongfully, immorally or in a depraved manner" and (2) *the government's* definition of the term *applied in the January 6 cases* is unconstitutionally vague.

When *Sandlin* turned to an as-applied challenge, it erred.  As in the government's analysis, the confusion arises from declining to address or acknowledge the distinction between different types of proceedings*, i.e.*, the context in which a word is used.  *Sandlin* acknowledged that in *Poindexter*, the D.C. Circuit found that equating "corruptly" with moral purpose definitions like "wrongfully" would be unconstitutionally vague and therefore held that "corruptly" must be interpreted transitively to require proof that a defendant influenced another person to violate their legal duty and thereby obstruct a congressional proceeding.  *Sandlin*, at *11 (citing *Poindexter*, 951 F.2d at 379).  But *Sandlin* then found that "Courts have since cabined *Poindexter*'s holding to its facts and have not read it as a broad indictment of the use of the word 'corruptly' in the various obstruction-of-justice statutes." *Id.* .  What the *Sandlin* Court failed to acknowledge or notice is that all of the post-*Poindexter* decisions it cites for that proposition occur in the inapposite context of judicial proceedings, not congressional ones.  *Id.* (citing cases). (These cases are inapposite and irrelevant because the Court was simultaneously assuming that investigations and evidence are not required for a Chapter 73 "proceeding"). Indeed, *Poindexter* itself noted the difference between congressional proceedings and judicial proceedings.[12]

---

[12]   *See Poindexter*, 951 F.2d at 377-78. (The term corruptly "must have some meaning

The next steps in *Sandlin's* analysis are difficult to assess.  The Court cited to virtually the same dictionary definitions of "corrupt" on which the *Poindexter* court relied.  *Id.*  Like *Poindexter*, the *Sandlin* Court noted the distinction between transitive and intransitive meanings. *Id.*  The Court then went on to hold that "the plain meaning of 'corruptly' encompasses both corrupt (improper) *means* and corrupt (morally debased) *purposes*." *Id.* (emphasis original). Citing decisions from the judicial proceedings context, it "agree[d] that § 1512(c)'s proscription of knowing conduct undertaken with the specific intent to obstruct, impede or influence the proceeding provides a clear standard to which the defendant can conform his behavior." *Id.* at 23. However, not only is a corruptly-is-merely-the-intent-to-obstruct standard plainly foreclosed by *Poindexter*, it is rejected by Judge Silberman's concurrence in *U.S. v. North*, on which the *Sandlin* Court itself relies.  910 F.2d 843, 940-41 (D.C. Cir. 1990) (an intent-to-obstruct definition "reads the word 'corruptly' out of the statute).

To make matters more confusing, the *Sandlin* Court then appeared to hold that "defining 'corruptly' to involve 'wrongfulness' presents a closer question because it may be subject to the same infirmities that *Poindexter* found in the words 'immoral' and 'improper.'" *Id.*  The Court appeared to resolve this problem by narrowing "wrongful" to "independently criminal conduct." *Id.* at *13.  The sole authority it cites is a nonbinding concurrence in *North*. *Id.*  But in applying this standard to the facts at issue, the Court appeared to indicate that "independently criminal conduct" may practically mean "very severe independently criminal conduct." For the Court found that "forcibly breach[ing] the Capitol Building, assasult[ing] Capitol police officers, and

---

... because otherwise the statute would criminalize all attempts to "influence" congressional inquiries – an absurd result that the Congress could not have intended in enacting the statute"); *United States v. Russo*, 104 F.3d 431, 436 (D.C. Cir. 1997) (in contrast to *Poindexter's* concern that not all efforts to obstruct Congress can be criminalized, "very few non-corrupt ways to or reasons for intentionally obstructing a judicial proceeding leap to mind").

encourage[ing] others to steal laptops and paperwork from the Senate Chamber" are acts that "fall on the *obviously* unlawful side of the line." *Id.* at *13 (emphasis added).

The *Sandlin* Court's definition of "corruptly" is neither consistent with D.C. Circuit precedent nor workable in practice. "Corruptly" cannot mean "independently criminal conduct" for various reasons. In the first place, it is rejected by *Poindexter*, a point the Court did not address. Poindexter's false statements to Congress predicated charges under both § 1001 and § 1505. 951 F.2d at 371. The D.C. Circuit reversed the § 1505 conviction on the ground that the government had not proven the "corruptly" element. It rejected Poindexter's challenge to his § 1001 conviction. *Id.* at 387. If a defendant's intent to obstruct a proceeding "while" committing an "independent violation of the law" were a proper definition of "corruptly," Poindexter's § 1505 conviction would not have been vacated.

Practically, this definition does not resolve the vagueness identified by the Court itself. If obstructing/influencing Congress is "corruptly" done whenever the defendant at the same time commits "independent criminal conduct" there remains the problem of an incomprehensible boundary between Class B misdemeanor and felony conduct. The government contends that every single protester who entered the Capitol on January 6 ipso facto committed a crime: entering a "restricted area," Title 40 "parading," or both. Yet in hundreds of cases, that conduct is classified as a misdemeanor even when it involved "influencing" or "obstructing" or "impeding" Congress.

To its credit, the Court appeared sensitive to this extremely serious concern of notice and fairness. After deciding *Sandlin* the Court entered an order in the *Reffitt* case holding that the vagueness doctrine may prohibit a § 1512(c)(2) charge as applied in that case. 21-cr-32-DLF, Minute Order 12/11/21. The Court therefore appeared to be defining "independent criminal

19

conduct" to mean, perhaps, "violent independent criminal conduct" or "felonious independent criminal conduct." While that distinction may matter in fairness terms, it does not appear to have anything to do with the meaning of the term "corruptly."

All these quandaries are avoided simply and without creating unnecessary distortions in the law. When a defendant assaults law enforcement—he has committed the offense of assault of law enforcement. 18 U.S.C. § 111. When a defendant steals property from the Capitol—he has committed the offense of theft of government property. 18 U.S.C. § 641. When a defendant destroys something at the Capitol—he has committed a separate offense still. 18 U.S.C. § 1361. All of the vagueness and confusion enters the analysis because the government insists on creating a novel offense that parasitically sits on top of these traditional crimes. The effect is to punish no separate category of conduct at the cost of distortion of legal concepts and criminal statutes in violation of the due process of law.

The *Sandlin* Court does not address the distinction between how "corruptly" is interpreted in judicial proceedings versus congressional ones. Outside the context of judicial proceedings, "corruptly" must be understood to require proof that the defendant obtained an unlawful advantage for himself or an associate and that he influenced another to violate their legal duty and thereby obstruct the proceeding.[13] Because those facts are not alleged in the indictment, the § 1512(c)(2) charges should be dismissed.

---

[13] *See* Crowl Reply to To Government's Omnibus Opposition To His Motion To Dismiss The § 1512(c)(2) Counts (ECF 400 at 12-21; *see also US v Nordean,* Case No. 21-cr-00175-TJK, Nordean Response To The Government's Supplemental Brief On The Meaning Of The Term "Corruptly" In The Context Of Obstruction Of Congress (ECF 226), attached herewith and incorporated by reference as Ex 2.

### E.    Official Proceeding

In *Sandlin*, the Court began by acknowledging that the term "proceeding" in § 1512(c)(2)'s "official proceeding" should not be construed in the lay sense but "understood narrowly, in a 'legal' sense." *Sandlin,* at \*3. For this distinction the Court relied on *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013). *Id.* However, after determining that *Ermoian* correctly rejected the lay meaning, the *Sandlin* Court did not then identify the legal-sense definition ultimately settled on by the Ninth Circuit. That definition was: "'the business done in courts.'" 752 F.3d at 1170 (quoting Black's Law Dictionary 1241 (8th ed. 2004)). The *Sandlin* Court did not note that the Ninth Circuit went on to elaborate that "the use of the preposition 'before'"—as, for example, in the phrase "a proceeding before the Congress," § 1515(a)(1)(B)—"suggests an appearance in front of [an] agency *sitting as a tribunal*." *Id.* at 1171 (emphasis added). In *Ermoian*, an FBI investigation did not "occur 'before a Federal Government Agency'" because it was not "like a hearing or trial . . ." *Id.* The *Sandlin* Court omitted that the court of appeals held that § 1512's terms, including "attendance," "testimony," "production," and "summon," "strongly impl[y] that some formal hearing *before a tribunal* is contemplated." *Id.* (emphasis added).

Instead, the *Sandlin* Court determined that a legal-sense definition of "proceeding" might be satisfied by "formality" per se, which need not entail adjudication or even investigation itself. *Id.* Here, however, the Court should note several things.

First, the *Sandlin* Court cites no authority for the proposition that a legal-sense "proceeding" may occur absent adjudicative procedures or any investigation. In over a century of obstruction of justice jurisprudence, there is none.

Second, the *Sandlin* Court omitted from its analysis this Circuit's binding decision in *U.S.*

*v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994).  There, the D.C. Circuit identified two qualities that

turn an investigation into a Chapter 73 "proceeding": "adjudicative power or . . . the power to

enhance the[] investigation[] through the issuance of subpoenas or warrants." *Id.* at 1127.

Notably, three of the attributes defining a Chapter 73 "proceeding" in *Kelley*, binding on this

Court, are absent from the January 6 joint session of Congress: (i) no investigation; (ii) no

adjudicative power;[14] and (iii) no power to issue subpoenas or warrants.  Notice, too, that the

*Sandlin* Court omits that the government stipulated in *Kelley* that "proceedings" under § 1505

(entailing congressional investigations and inquiries) are "parallel" to those in § 1512.[15]

Third, the Court should note that the *Sandlin* Court arrived at its holding that "official

proceeding" is satisfied by "some formal[ity]. . ." *Id.* at *3 (citing *United States v. Ramos*, 537

F.3d 439 (5th Cir. 2008)).  It quotes *Ramos*: "That [a] proceeding occurs 'before' an agency

implies 'some formal convocation of the agency in which parties are directed to appear, instead

of any informal investigation conducted by any member of the agency.'" *Id.* (quoting *Ramos*,

537 F.3d at 462-63).  This Court will recall that in one of the many supplements the government

has submitted in this case it quoted *Ramos*'s "some formal convocation" formula—and omitted

the connected phrase "in which parties are directed to appear." The *Sandlin* Court appropriately

included the latter phrase.  But the inclusion defeats the Court's formality per se definition:

---

[14] By not addressing adjudicative power under *Kelley*, the *Sandlin* Court thus avoided whether
the "formal" (not to say "adjudicative") procedures under the Electoral Count Act of 1887 permit
Congress to adjudicate the outcome of a non-deadlocked presidential election contrary to the
Constitution's Elector Clause and the Twelfth Amendment, and whether the ECA was
nonbinding on Congress (whose actions on January 6 were therefore not intrinsically
adjudicative) as a piece of unconstitutional legislative entrenchment.  *U.S. v. Winstar Corp.*, 518
U.S. 839, 872 (1996).  (Ironically, that was the very argument that then-President Trump was
hoping to have Vice President Pence adopt to invalidate the electoral college returns of the
various states).

[15] The government might be expected to recall this key stipulation.  The appellate lawyer who
personally stipulated the §§ 1505-1512 "parallel" was Merrick Garland.

"parties" are by definition those opposed in an adjudicatory proceeding to which they "are directed to appear." 537 F.3d at 462-63.  Notice, too, that *Ramos*, like *Kelley*, presumes the Chapter 73 "proceeding" will involve an investigation.  All of the relevant case law does.

Fourth, although the *Sandlin* Court concludes that an "official proceeding" must at least "be akin to a formal *hearing*," it does not define "hearing." *Id.*  (emphasis added).  However, courts define "hearing" as "'a proceeding of relative formality . . . generally public, with definite issues of fact or of law to be tried, in which witnesses are heard and parties proceeded against have the right to be heard . . .'" *U.S. ex rel. Health Choice All.*, *LLC v. Eli Lilly & Co.*, 4 F.4th 255, 264 (5th Cir. 2021) (quoting *Hearing*, Black's Law Dictionary (5th ed. 1979)).  The Court's description of the ECA's electoral certificate-counting procedures does not entail "issues of fact or law" to be decided, "in which witnesses are heard and parties proceeded against have the right to be heard." *Id.*  Put another way, the adjudicative problem cannot be solved by sweeping it under a rug called "hearing," even if one places the adjective "formal" before it.  Perhaps understanding this, the Court hedges the word "hearing" with qualifiers like "trappings of" and "akin to" and "analogous." *Id*. at *4.  But there is no such crime as "obstruction of the 'trappings' of justice" or "obstructing something 'akin to' a justice-like analogy."  Until January 6, federal laws have not been construed to criminalize on the plane of simile and metaphor.

Fifth, the *Sandlin* Court found that "a related provision in the same chapter of Title 18 makes clear that congressional proceedings under § 1512(c) need not be 'court-like.'" *Id.* Specifically, the Court noted that under § 1503 it is unlawful to corruptly obstruct "the due administration of justice." To avoid redundancy with "official proceeding" in § 1512(c), the Court declined to "read an 'administration of justice' requirement into 'official proceeding'" and so "official proceeding" must be broader. *Id.*  Here, the Court incorrectly assumed that the "due

administration of justice" term reaches all adjudicatory proceedings and proceedings involving investigations. It does not. Every circuit that has defined the "due administration of justice" has held that its meaning is coterminous with judicial proceedings.[16] But a proceeding may be adjudicative or at least involve an investigation even if it is not judicial: for example, the Iran-Contra proceedings in Congress. Thus, the "due administration of justice" phrase in § 1503 is not a basis for defining "official proceedings" short of adjudicatory procedures or investigations.

Finally, the *Sandlin* Court did not address a determinative canon of statutory construction. Courts "assume Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). A party must clearly overcome that assumption to establish that Congress intended a change to the meaning given legal terms by related statutes and their judicial gloss. *Hubbard v. United States*, 514 U.S. 695, 700 (1995). "When Congress uses the language of one statute in another statute it usually intends both statutes to have the same meaning." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1249 (D.C. Cir. 2004). And when interpreting statutes, the "assumption is that Congress knows the law – by which the Supreme Court means judicial decisions." *Id.* Put another way, when it comes to interpreting statutory terms, "meaning is use"; statutory meaning is not a just-this-once definition arrived at ex post ("some formal[ity]. . ." *Id.* at *3).

---

[16] *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

How has the term "proceeding" been *used* in the context of Chapter 73? In a century or more of obstruction of justice jurisprudence predating the passage of the Sarbanes-Oxley Act of 2002, the obstruction of justice term "proceeding" had never been construed to encompass any "formal" meeting of people lacking adjudicative power or an investigation.  To the contrary, the D.C. Circuit had held at least twice before SOX's passage that those qualities are required of a Chapter 73 "proceeding." *Kelley*, 36 F.3d at 1127; *United States v. Poindexter*, 951 F.2d 369, 380-82 (D.C. Cir. 1991).  Thus, because there is no evidence of a contrary understanding of "proceeding" prior to § 1512(c)(2)'s codification, the *Sandlin* Court should have "assumed" that Congress did not intend a sub silentio amendment to the historical sense of that term as used in the statute.  *Avocados Plus Inc.*, 370 F.3d at 1249.  When novel, just-so constructions are placed on criminal statutes after the fact—and in such a noticeable way—it creates a regrettable impression in the public's mind of outcome-oriented decision making.[17]

---

[17]  Counsel wants to acknowledge the substantial work done in the preparation of this submission by Nicholas D. Smith, Esquire, who represents Mr. Nordean in Case No. :21-cr-00175-TJK.

**Conclusion**

For all the reasons set forth above and in his previous motion and memoranda, Mr. Crowl respectfully requests that this Honorable Court dismiss Counts 1 and 2 of the Sixth Superseding Indictment, which charge a violation of 18 U.S.C. 1512(c)(2).  This statute as applied to Mr. Crowl is unconstitutionally vague as it failed to give him fair notice that entry into the United States Capitol as part of a political demonstration would subject him to a felony conviction, with a maximum penalty of 20 years' imprisonment.  Application of the statute to him allows for the arbitrary and discriminatory enforcement of a criminal statute in violation of his rights to due process of law.  It also infringes his First Amendment rights to freedom of speech, of association, and of assembly to petition the Government for redress of grievances.  Indeed, such a novel application of the law to him also works as an ex post facto violation.  Finally, this application of the obstruction statute to a person like Mr. Crowl, who was involved in a political demonstration, will chill the First Amendment rights of all Americans.

Dated: December 13, 2021                            Respectfully submitted,


                                                    **Carmen D. Hernandez**
                                                    _____
                                                    Carmen D. Hernandez
                                                    Bar No. MD03366
                                                    7166 Mink Hollow Rd
                                                    Highland, MD  20777
                                                    240-472-3391

**<u>Certificate of Service</u>**

I hereby certify that on the 13th day of December, 2021, I filed the foregoing Notice via ECF on all counsel of record.


**Carmen D. Hernandez**

_____

Carmen D. Hernandez