**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-28-APM** |
| **DONOVAN CROWL** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On January 6, 2021, Defendant Donovan Crowl joined together and with other members and affiliates of the Oath Keepers to breach the United States Capitol and stop Congress from certifying the 2020 presidential election. Once inside, the defendant participated in a mob that tried to push past officers down the hallway to the Senate Chamber. The defendant and his co-defendants only retreated when the police deployed chemical spray against them. For his role in this unprecedented attack on the peaceful transfer of power, the Court should depart or vary upwards and impose a sentence of 30 months of incarceration, followed by a period of three years of supervised release, and order the defendant to pay $2,000 in restitution to the Architect of the Capitol.

## I.    BACKGROUND

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the election, the defendant donned paramilitary gear and clothing and marched with other Oath Keeper members and affiliates to the United States Capitol. When he arrived on the Capitol grounds, a leader of the group—Kelly Meggs—announced that they were going inside to try to stop the vote count. In response, the defendant joined hands on shoulder with eight other

members of their group ("Line One") and moved, in a coordinated and calculated fashion, up the steps of the Capitol:



At the top of the stairs, the defendant and his co-conspirators joined the mob that overcame officers guarding the door.   As he entered the building, alarm bells blared, and rioters chanted, "Treason!"

Once inside, the group entered the Rotunda and then split up.   Half of the group headed toward the House of Representatives.   Kelly Meggs would later say that they were looking for Speaker of the House Nancy Pelosi.   They did not find Speaker Pelosi and ultimately left the building.   The other half of the group—which included the defendant—joined rioters who were trying to push their way through a line of D.C. Metropolitan Police Department officers guarding a hallway that led to the Senate Chamber.   The officers were forced to deploy chemical spray to

hold back the mob.   The defendant then retreated, regrouped, exited the Capitol, and met up with the other Oath Keepers.

The Oath Keepers' attack on the Capitol was the culmination of weeks, if not months of plotting by the leader of the Oath Keepers, Elmer Stewart Rhodes III, and his regional deputies to oppose by force the lawful transfer of power from President Donald J. Trump to President-Elect Joseph R. Biden, Jr.   Defendant Crowl answered that call.   In the days before January 6, he traveled from Ohio with three of his co-conspirators, armed with battle gear and firearms, for the purpose of delaying the interfering with Congress' certification of the election.   On January 6, Crowl joined with his co-conspirators and seized the opportunity to further this unlawful goal.

### a.  Summary of Evidence

The evidence presented at trial established that the defendant participated in a conspiracy with Oath Keepers members and affiliates to prevent, hinder, or delay Congress' certification of the 2020 election, and to use force, intimidation, or threats to prevent members of Congress from discharging their duties during that proceeding.   Then, on the afternoon of January 6, he marched to the Capitol and breached its restricted building and grounds in furtherance of this unlawful agreement.

### i.  The Plot to Oppose by Force the Lawful Transfer of Power

On November 5, 2020, two days after the Presidential Election, the leader of the Oath Keepers, Elmer Stewart Rhodes III, sent a message to an encrypted Oath Keepers group chat stating, "We MUST refuse to accept Biden as a legitimate winner . . . We aren't getting through this without a civil war.  Too late for that.  Prepare your mind, body, spirit." ECF No. 987, ¶5 (Stipulated Facts and Evidence).     Rhodes also encouraged Oath Keepers to oppose the election

3

results and travel to the District of Columbia for the "Million MAGA March" during a virtual "GoToMeeting" held on November 9, 2020.  ECF No. 987, ¶8. That meeting was attended by Ohio Oath Keepers member Jessica Watkins ("Watkins") and by Kelly Megs.

During the Oath Keepers GoToMeeting, Watkins messaged the defendant, "Be ready to march on D.C. on Saturday. Driving out Friday night. Hooah?" ECF No. 987, ¶14.  In addition to being an Oath Keepers member, Watkins was the leader of the "Ohio State Regulars Militia," of which the defendant was also a member.  *Id.*  The defendant, expressing an expectation for violence, responded, "I'm on board Capt'n. I'll make some eggs. N nightsticks. Let's party!!!"  *Id.* Watkins continued, "This is what we've been waiting for. It's not just an Oath keeper mission. Patriots everywhere. 3 Percenters too. Let's make history motherfucker."  *Id.*

Two days later, Watkins asked another Oath Keeper member, "[Y]ou still do vetting for OK's? I have one of my militia guys coming to DC that needs to be vetted in order to participate." *Id.* at ¶15.  Watkins then provided the defendant's name and stated, "He said he will join up Oathkeepers before Friday." *Id*.  A short while later, the other Oath Keepers member responded, "Stuart said good to go vetted in tell my new brother welcome."   The defendant traveled to Washington, D.C., and attended the march along with Watkins, Rhodes, and other members and affiliates of the Oath Keepers.  *Id.* at ¶16.  After the event, the defendant wrote co-conspirator Thomas Caldwell that he believed, "War is on the Horizon."  *Id*

After the November event in Washington, D.C., Rhodes' and his deputies' calls for resistance and violence only escalated in the weeks that followed.  On December 31, 2020, Rhodes wrote, "On the 6th, they are going to put the final nail in the coffin of this Republic, unless we fight our way out.  With Trump (preferably) or without him, we have no choice."  Gov. Ex.

9726 (Msg. 1.S.696.17678).[1]   On December 22, Kelly Meggs similarly messaged the OKFL Hangout Signal group, "It's easy to chat here.   The real question is who's willing to DIE, that's what the Patriots did by the thousands.   We are worried about getting the day off."   Gov. Ex. 9728 (Msg. 1.S.656.9322).   Watkins likewise told a recruit to her militia that she should prepare to fight to the death, warning that "if Biden get[s] the steal, none of us have a chance in my mind. We already have our neck in the noose. They just haven't kicked the chair yet."   Gov. Ex. 9801 (Msg. 192.T.984-988).

On December 14, 2020, the same day that presidential electors from each state and the District of Columbia cast their votes in the Presidential Election, Rhodes published an "Open Letter" to President Trump on the Oath Keepers website. ECF No. 987, ¶9.   In the letter, Rhodes encouraged President Trump to "NOT concede," but rather, "act NOW as a wartime President." *Id.*   Rhodes continued, "We are already in a fight.   It's better to wage it with you as Commander-in-Chief than to have you comply with a fraudulent election, leave office, and leave the White House in the hands of illegitimate usurpers and Chinese puppets." *Id.*   Rhodes offered that "millions of American military and law enforcement veterans, and many millions more loyal patriotic American gun owners stand ready to answer your call to arms, and to obey your orders to get this done." *Id.*

The defendant shared and echoed these same sentiments.   On December 22, 2020, the defendant sent a message to a group chat that included Watkins in which he stated, "Gun smoke, lead, God n country. Law abiding citizens are fix'in to act 'out of character.' I'm one of 'em ..one

---

[1]      Exhibit citations herein are to exhibits introduced in the stipulated trial against the defendant and in the *United States v. Parker, et al,* (21-cr-28) trial.

of many. Time for talk'in is over."   *Id.* at ¶20.

    *ii.   Travel to Washington, D.C., for January 6*

A critical component of the Oath Keepers' preparation for January 6 was to have an organized quick reaction force ("QRF"), comprised of individuals positioned with a cache of weapons, who could be summoned into the city if ordered by Rhodes.   *See, e.g.*, Gov. Ex. 9750. The defendant was aware of preparations for a QRF.   On January 1, 2021, the defendant reached out to Caldwell to ask, "Will probably call you tomorrow...mainly because...! like to know wtf plan is. You are the man Commander."   *Id.* at ¶23.   Caldwell informed the defendant that the group had prepared a QRF, writing to the defendant that, "Paul has a room and is bringing someone. He will be the quick reaction force."   *Id.*   Consistent with this, on January 4, 2021, Watkins told Bennie Parker, "Weapons are ok now as well. Sorry for the confusion."   *Id.* at ¶24.

The defendant then traveled to Washington, D.C., with Watkins and Bennie and Sandra Parker.   Consistent with her prior messages regarding weapons, while en route to Washington, D.C., on January 4 at 2:28 p.m., Watkins messaged the OK FL DC Op Jan 6 Signal group, "We will be in VA @ 8pm. Where can we drop off weapons to the QRF team? I'd like to have the weapons secured prior to the Op tomorrow. Our hotel is in Arlington, VA by the Metro station, but we don't check in until tomorrow. Staying with family this evening in Winchester."   Gov. Ex. 9723 (Msg. 53.T.2.107).   Ultimately, they left their weapons in Winchester, Virginia. 02/15/2023PM Tr. at 2338.

When they arrived in the D.C. area, however, the defendant, Watkins, and the Parkers stayed at the Comfort Inn Hotel, where the QRF was staged.   Additionally, the defendant expressed an expectation of violence nevertheless.   On the evening of January 5, 2021, the

defendant Facebook messaged an acquaintance, "We are doing the W.H. in the am and early afternoon, rest up at the Hotel. Then headed back out tomorrow night 'tifa hunt'in.'"

### iii.  January 6, 2021

On January 6, at 1:25 p.m., Rhodes sent a message to the "DC OP: Jan 6 21" Signal group, stating, "Pence is doing nothing.  As I predicted."  Gov. Ex. 1500.5.  Moments later, Watkins shouted to the group around her, which included the defendant, "Move!"  The group, including the defendant, then began moving toward the Capitol. ECF No. 987, ¶47.

As the group marched, at 1:50 p.m., Watkins made an announcement on the "Stop the Steal J6" channel on Zello: "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol . . .  We have about 30-40 of us.  We are sticking together and sticking to the plan."  *Id.* at ¶47.  About ten minutes later, she made another announcement on the channel stating, "Y'all, we're one block away from the Capitol right now.  I'm probably gonna go silent when we get there, because I'm gonna be a little busy."  *Id.*  The group, which included the defendant, approached the Capitol grounds and entered the restricted area.  *Id*. As they moved inside the restricted area of the Capitol grounds, the group stopped twice.  *Id*. During one of these huddles, Kelly Meggs told the group they "were going to try and stop the vote count."  *Id.*  Immediately thereafter, Kelly Meggs led Line One in a single line up the Capitol steps, each individual with their hands on shoulders of the person in front of them.  Gov. Ex. 1050.1.E.4.

Once inside the Capitol, the group entered the Rotunda.  ECF No. 987, ¶53.  There, the defendant rejoiced in the attack, and was captured on video gloating, "We took over the Capitol! Overran the Capitol!"  Gov. Ex. 1504.  The group then split in half, with one half headed

toward the House of Representatives.   *Id.*   Kelly Meggs would later say that they were looking for Speaker of the House Nancy Pelosi.   *Id.*   The other half of the group, including the defendant, joined a group of other individuals that was trying to push their way through a line of D.C. Metropolitan Police Department officers guarding a hallway that led to the Senate Chamber.   *Id.* at ¶54.   As the group pushed against the officers, Watkins yelled, "Push, push, push. Get in there. They can't hold us."   *Id.*   The rioters in the Senate Hallway were eventually repelled by law enforcement officers using chemical spray.   *Id.*

The conduct of the defendant, his co-conspirators, and the other rioters caused scores of law enforcement officers to suffer physical and emotional injuries; terrified congressional staff and others on scene that day, many of whom fled for their safety; and resulted in over a million dollars in damage to a historic and symbolic building.   Members of the House of Representatives and the Senate, including the President of the Senate, Vice President Michael R. Pence, were forced to evacuate their chambers, and the Joint Session was suspended.   The Joint Session was not able to resume until after 8:00 p.m. that evening, after the building was cleared and secured.   And the cost to our democracy and system of government was incalculable.   *See United States v. Gardner*, No. 21-cr-622 (Mar. 16, 2023), Sent. Tr. at 68 (identifying one of the "victims" on January 6 as "democracy itself").

### iv.  Actions After January 6

During their assault on the Capitol and in the immediate aftermath of January 6, the defendant and his co-conspirators celebrated and took credit for their actions that day.   Watkins sent a Signal message to another individual, stating, "We were in the thick of it.  Stormed the Capitol.  Forced our way into the Senate and House.  Got tear gassed and muscled the cops back

like Spartans." ECF No. 987, ¶65. Caldwell told the defendant, "We stormed the gates of corruption together (although on opposite sides of the building)." *Id.* at ¶66. Caldwell continued, "We need to do this at the local level. Lets storm the capitol in Ohio. Tell me when!" *Id.* The defendant responded, "Damned Straight!! We are gonna leave about 1030 in the am. You wanna have coffee and share war stories? Got any Crown?" *Id.*

Later the evening of January 6, the defendant sent a message to a Facebook acquaintance stating, "Yes...we went in through the east 'back' door. Just as they broke through the front door. I'll have to tell you about it...It....was...EPIC!!! Hope they got the message. The Storm has arrived. We've been laughing about it. We are rioters, thugs, and violent......[two emojis]." *Id.* ¶67. Likewise, the defendant messaged another Facebook acquaintance, "History was made today Sugar. We will fight." *Id.* ¶68.

### b. The Charges and Penalties

For his role in the attack on the Capitol, the defendant was charged with conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count One); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Three); destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count Four); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Five); and interfering with law enforcement officers incident to a civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2 (Count Seven). ECF No. 684.

The government agreed to a stipulated trial only on Count One (18 U.S.C. § 1512(k)) and Count Seven (18 U.S.C. §§ 231(a)(3), 2). The defendant was convicted of both counts and pursuant to the agreement between the parties, following the trial, the government moved to dismiss the remaining counts in the Indictment. There was no agreement between the parties about the estimated United States Sentencing Guidelines range, and no agreement concerning what sentence either party would request. ECF No. 987, p.1.

On January 8, 2025, Crowl moved this Court to vacate its guilty verdict as to Count One, which charged conspiracy to obstruct an official proceeding in violation of 18 U.S.C. § 1512(k), arguing that the evidence was insufficient to sustain that conviction in light of the Supreme Court's decision in *United States v. Fischer*, 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024). ECF No. 1220. In that decision, the Supreme Court held that, in order to convict a defendant under Section 1512(c)(2), the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in the proceeding – such as witness testimony or intangible information– or attempted to do so. Because of the unique circumstances of Crowl's case, the government did not oppose the defendant's motion. Thus, Crowl stands before this Court to be sentenced solely on one charge: Count Seven, interfering with law enforcement officers incident to a civil disorder. The Pre-Sentence Report ("PSR") correctly recounts the statutory penalty for interfering with law enforcement officers incident to a civil disorder: the maximum statutory penalty is five years of incarceration. Sentencing is scheduled for January 22, 2025.

## II.    SENTENCING GUIDELINES

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point" for determining a defendant's sentence. *Id.*  The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline for each count; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.  U.S.S.G. § 1B1.1(a)(1)-(3).  Then, repeat each step for each count.  U.S.S.G. § 1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3.  *Id.*

### a.  The Applicable Guideline, Base Offense Level, and Applicable Specific Offense Characteristics and Adjustments

The PSR applies the appropriate Sentencing Guidelines and specific offense characteristics, given the defendant's relevant conduct.  First, the PSR correctly determines that the appropriate Chapter Two offense guidelines for Count Seven, 18 U.S.C. § 231(a)(3), Interference with Law Enforcement Officers During a Civil Disorder: Under U.S.S.G. § 2X5.1, since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."  Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."  Under U.S.S.G. § 2X5.1, since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."  Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."  The base offense level under that provision is 10.

The PSR also correctly applies a three-level upward adjustment, under U.S.S.G. § 2A2.4(b)(1)(A), for an offense involving physical contact. Here, Crowl joined a group of individuals who tried to push their way through a line of MPD officers guarding a hallway that led to the Senate Chamber.

The government agrees that the defendant is eligible for a two-level downward adjustment for acceptance of responsibility. Pursuant to USSG §3E1.1, comment n.1(A), one of the factors the Court should consider is whether the defendant "truthfully admit[ted] the conduct comprising the offense(s) of conviction." Here, in agreeing to a stipulated trial, the defendant admitted the facts that formed the basis of his conviction.

For all of these reasons, the defendant's adjusted offense level is 11:

| Base Offense Level: | 10 | §2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | §2A2.4(b)(1)(A) (physical contact) |
| Adjustment | -2 | §3E1.1 (acceptance of responsibility) |
| Total | 11 | |

The defendant does not have any applicable criminal history, so he a Criminal History Category I. At a level 11, and a Criminal History Category I, the Guidelines recommend a sentence of 8-14 months of incarceration.

### b. Grounds for Departure

The Court should not apply any downward departure. The Court should depart upward from the Guidelines range for the defendant's relevant conduct in this case for the bases explained below and in the sentencing allocution section.

### i.    Section 4C1.1, Zero-Point Offender

Crowl does not meet the criteria at USSG §4C1.1, as he used credible threats of violence in connection with this offense and played a role in transporting firearms in connection with this offense. USSG §§4C1.1(a)(3), (7). The government introduced evidence at trial that Crowl planned with members and affiliates of the Oath Keepers to oppose the lawful transfer of power following the 2020 presidential election; that Crowl and his affiliates viewed Congress' certification of the election on January 6, 2021, as a potential day of action for their plans; that Crowl and his affiliates established an armed "quick reaction force" to support their January 6 operation; and that on January 6, Crowl breached the Capitol and, once inside, joined a mob that tried to push past officers to the Senate Chamber.   The offense for which Crowl is being sentenced involves interfering with officers during a civil. Given this evidence of the use of violence and firearms in connection with the offense of conviction, the downward adjustment for lack of criminal history is not appropriate here.

### ii.    Section 3A1.4, Note 4 (Terrorism)

As in the *Rhodes, Minuta,* and many of the *Parker* sentencings, the Court should depart upward because the defendant committed offenses that were calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct. The defendant was an active participant in the Oath Keepers' conspiracy to prevent, hinder, or delay the certification proceeding, and to use force, intimidation, or threats to prevent members of Congress from discharging their duties during that proceeding.

Note 4 to Section 3A1.4 provides that an upward departure is "warranted" if the defendant's "offense was calculated to influence or affect the conduct of government by

13

intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4(A). When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged, structured upward departure,*" the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied." Sentencing Guidelines, App. C, amend. 637 (2002) (emphasis added).

The conduct of the defendant was clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4., cmt. n.4. A defendant's offense is so "calculated" if that offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012). As this Court recently observed in sentencing the defendants in the related *Rhodes* matter,

> [I]t is challenging to find that in a case where individuals were convicted of participating in a [] conspiracy to stop the lawful transfer of power after a United States Presidential election, that they plotted to use force in so doing—it is very hard to not see that as terrorism within the definition cer tainly at least Note 4. That is certainly conduct that is calculated or intended to result in the coercion and intimidation of the government in order to achieve some purpose.

5/25/23AM Tr. at 36. The Court was, at the time, sentencing Defendant Rhodes, who was convicted of seditious conspiracy, but the Court has since found the Note 4 departure applied equally to all but two of the coconspirators. In sentencing Watkins, the Court focused on the fact that "her offense was clearly calculated to influence or affect the conduct of the government by intimidation or coercion," because "her words and her captured actions inside the building and

14

leading up to the building leave no doubt what was the true object of her force."   5/26/23AM Tr.
at 11.

So, too, with the defendant.   For the following reasons, the Court's verdict reflects the
ample evidence that the defendant's offenses were "calculated to influence or affect the conduct
of government, or to retaliate against government conduct."   U.S.S.G. § 3A1.4, cmt. n.4(A).

*First*, evidence of the defendant's conduct on January 6 itself demonstrates his intent to
use force in order to impede Congress and stop the certification proceeding.   Shortly after Rhodes
issued the call to action that day, his co-conspirators (including the defendant) marched to the
Capitol and then toward the east side doors in stack formation.   There, they breached a line of
officers and advanced toward the House and Senate chambers.   And while the breach of the
Capitol unfolded and Members of Congress evacuated, members of the QRF monitored events
from the staging location where the conspirators' weapons were stockpiled.[2]   The defendant
conspired to and did, in fact, cause significant injury and damage at the Capitol.[3]   As Judge Mehta
held in the sentencing hearing in the related *Rhodes* case, Note 4 clearly applies to the conspiracy

---

[2] As described in greater detail above, Defendant Crowl discussed plans for the QRF with co-
conspirators Watkins and Caldwell, and his group left Ohio with weapons they intended to
contribute to the QRF, although they ultimately did not.

[3] While there is direct evidence of the defendant's state of mind, their preparations for and
engagement in an attack on Congress in and around the Capitol on January 6 also allows a "natural
inference" that is sufficient to satisfy the "calculation" requirement of Section 3A1.4.   *Wright*,
747 F.3d at 408-09 (citing *United States v. Dye*, 538 F. App'x 654, 666 (6th Cir. 2013); *see also*
*Mohammed*, 693 F.3d at 202 (court may draw "plausible inferences" to find requisite
"calculation"); *United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021) ("because a
defendant often will not admit his full knowledge or intentions, the district court may find the
requisite calculation or intent existed based on circumstantial evidence and reasonable inferences
drawn from the facts").

charged herein, because "Mr. Rhodes and his compatriots' objective was to affect the conduct of government, specifically Congress, and to do so through intimidation and coercion by means of force, both through the stockpiling of weapons in the event that they needed to be brought across the river -- there was an agreement as to that -- and then, of course, the actual use of force by others who went into the building and applied that force against police officers who were doing their duty that day."  5/25/23AM Tr. at 78-79.

*Second*, as described in greater detail above, the government introduced evidence of the defendant's statements before, during, and after January 6 confirming that he intended for his coercive and intimidating actions to influence or affect government conduct.

*Finally*, the defendant's choice of target itself further demonstrates their intent to intimidate and affect the government.  A defendant's specific intent to influence and retaliate against government conduct for purposes of Section 3A1.4 can often "be inferred from the defendant's choice of target." *Khatallah*, 314 F. Supp. 3d at 198.  Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199.  That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing cases).  Clearly, attacking the seat of our government while the entire complement of legislators and the Vice President of the United States were inside performing their constitutional and statutory duties is a strong indication of intent to influence or affect the government, or to retaliate against government conduct.

In short, the defendant's and his co-conspirators' conduct displayed a clear, shared intent to stop Congress from certifying the results of the election, including through the organized use of

16

force and the staging of weapons nearby.   That conduct—calculated to stop the peaceful transfer of Presidential power for the first time in the nation's history—is a quintessential example of an intent to influence government conduct through intimidation or coercion and warrants an upward departure pursuant to Note 4.   Indeed, the terrorism enhancement in Section 3A1.4 is meant to "punish[] more harshly than other criminals those whose wrongs served an end more terrible than other crimes."  *Benkahla*, 530 F.3d at 313.

Accordingly, applying the same framework the Court used for determining the appropriate sentencing ranges for the co-defendants and co-conspirators, the governments seeks an upward departure of one level for Defendant Crowl.

### iii.     *Alternative Bases for Upward Departure*

Aside from Note 4, other provisions in the Sentencing Guidelines provide independent and further bases for the Court to depart upwards from the defendant's Guidelines range.   The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2).   The Guidelines also specifically provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[4]   In such circumstances, "the court may increase

---

[4] This departure "ordinarily would not be justified when the offense of conviction is . . . obstruction of justice . . . unless the circumstances are unusual."   Id.; see also § 3A1.2, cmt. n.5; § 2A2.4, cmt. n.3 (regarding additional relevant bases for applying Section 5K2.7).   Here, the

the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."   Similarly, an upward departure under Section 5K2.6 may be warranted "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense."[5]   Moreover, U.S.S.G. § 5K2.21 provides that "[t]he court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range."

Here, the Court found Crowl guilty of conspiring to obstruct Congress' certification of the Electoral College vote, but that conviction likely will be set aside because the jury instructions applied by the Court did not reflect the full elements of the offense as clarified by the Supreme Court in *Fischer*.   Crowl was an avid and willing participant in an unprecedented crime.   He

---

circumstances of the offense are unusual: the defendant sought to disrupt a government function that is integral to our democracy and is mandated by the Constitution itself—the Certification of the votes of the Electoral College.   See U.S. Const. amend. XII.   This departure provision does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."   *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

[5] Courts of appeals have affirmed upward departures for firearms possession under Section 5K2.6 in fraud cases, premised on the idea that the fraud Guideline does not take into account the use of a weapon, and therefore does not adequately capture a defendant's dangerousness or the seriousness of the offense.   *United States v. Paslay*, 971 F.2d 667, 672 (11th Cir. 1992); *United States v. Gaddy*, 909 F.2d 196, 199-200 (7th Cir. 1990).   The courts in *Paslay* and *Gaddy* departed upward by four and two levels, respectively (though the *Paslay* court departed upward on multiple grounds).   Many Guidelines provide a two-level increase if a firearm was possessed.   *See, e.g.*, U.S.S.G. § 2B2.1(b)(4) (burglary); § 2B2.3(b)(2) (trespass); § 2B5.1(b)(4) (counterfeit bearer obligations); § 2B5.3(b)(6)(B) (criminal infringement of copyright).   Others provide a three-level increase for the same characteristic.   *See, e.g.*, U.S.S.G. § 2B3.1(b)(2)(E) (robbery); § 2B3.2(b)(3) (extortion by force).

joined mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses.   His conduct targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy.   Like every member of the mob, Crowl "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024).

And Crowl's participation in the attack on the Capitol was not spontaneous.   It followed weeks of plotting with his co-conspirators different ways to oppose the certification of the election. It included planning to have an armed "quick reaction force" support operations on the ground on January 6.   As this Court has observed, engaging in "a series of acts in which you and others committed to use force, including potentially with weapons, against the government of the United States as it transitioned from one President to the other," is "among the most serious crimes an individual American can commit."   *United States v. Rhodes, et al.*, No. 22-cr-15, 5/25/23AM Tr. at 113.   "It is an offense against the government to use force. It is an offense against the people of the country." *Id.*

Additionally, the conspiracy Crowl joined involved the staging of an arsenal of semi-automatic rifles and other firearms just across the Potomac River, yet the use and possession of those weapons is not reflected by any increase in the total offense level under the applicable Guidelines range.   Defendant and his co-conspirators all left their home states with weapons they planned to contribute to the QRF, although Defendant and his Ohio traveling companions ultimately left their weapons in Winchester, Virginia.

19

But nothing in this defendant's Guidelines calculation reflects these facts. Defendant would face the same offense level if his crime had not endangered the democratic process, interfered with the peaceful transfer of power, or involved an armed quick reaction force backing up those like Crowl on the ground at the Capitol.[6] In other words, a sentence within the defendant's Guidelines range here would not fully "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Several judges of this Court have upwardly departed in January 6 cases because, in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

Recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in

---

[6] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2)

count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months.   Judge Kelly

found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct

still included "an intent to obstruct or interfere with that proceeding, that important constitutional

proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether

our constitutional process will proceed or whether a mob would interfere with that process." *Sparks*

Sentencing Tr., at 87-88.   The court found that the "typical person convicted of [18 U.S.C. § 231]

engaged in nothing at all like the attack on the Capitol and the certification." *Id.* at 94-95. Because

Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account

for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that

statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function.

And not any proceeding, but one foundational to our country's governance." *Id.* at 93.   The court

found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays

an important role in explaining why" Sparks' advisory guideline range did not fully account for

his criminal conduct. *Id.* at 94.   Accordingly, the court found a significant upward departure was

warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal

amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of

imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a

defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the

court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson*

Sent. Tr., at 59.   But the court also found that an upward departure was appropriate pursuant to

U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61.   The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Likewise, in *United States v. Dunfee*, 23-CR-36-RBW, Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote.   Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power."   *See United States v. Dunfee*, 23-CR-36-RBW, ECF No. 90, at 2. From an advisory range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

More recently, in *United States v. Oliveras*, 21-CR-738-BAH, Judge Howell sentenced a defendant on a § 231(a)(3) conviction, a § 111(a)(1) conviction, and four misdemeanors, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*.   Judge Howell found an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because after *Fischer*, with the dismissal of [the defendant's] 1512(c)(2) conviction, none of the conduct

that goes into determining defendant's sentencing guidelines reflect his intent to engage in political violence that poses such a threat to our American democracy… His intent to obstruct Congress in the Electoral College certification by violence, if necessary, go above and beyond what any of his current convictions now take into account. *Oliveras*, 21-cr-738 (BAH), Sentencing Tr. at p. 49. The court noted that "[i]n assessing the extent of the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G. §] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide… [and] an upward departure within that range is appropriate." *Id.* at 49-50. The court also noted that it "would impose the same sentence with… an upward variance for the same reasons that are outlined in 5K2.7 and consideration of the 3553(a) factors." *Id.* at 97. From an advisory Guidelines range of 37-46 months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

Because the seriousness of defendant's crime is not adequately captured by the applicable Guidelines here, an upward departure is appropriate. If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

Several judges in this district have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt,* 21-CR-32-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-

CR–638-TJK, Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[7]

For all these reasons, the government submits that an upward departure or variance would be warranted to reach an appropriate sentence in this case.   To avoid unnecessary litigation, if the court applies either an upward departure or variance, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether it had applied that departure or variance, as an appropriate sentence considering the 3553(a) factors.

---

[7] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

### c. Applicable Sentencing Guidelines Range

If the Court applies just a one-level terrorism adjustment under Note 4 to Section 3A1.4, the defendant would be at a level 12, with a recommended sentence of 10-16 months of incarceration.   The government submits the Court should also depart upward by at least five additional levels, to account for the fact that the Guidelines range does not adequately reflect the historic and unprecedented nature of the defendant's crimes, the extensive planning and scope he engaged in as part of this conspiracy, the significant disruption to a government function caused by the defendant's conduct, and the significant and alarming role that weapons played in the conspiracy the defendant joined.   At a level 17, the Guidelines would recommend a sentence of 24-30 months of incarceration.

## III.    SECTION 3553(a) FACTORS

The Court's sentence must be guided by the factors in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate general and specific deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). Here, these factors weigh in favor of a significant sentence of incarceration: namely, a sentence at the top end of the adjusted Guidelines range, or two-and-a-half years' imprisonment.

### a. Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The defendant has a history of dismissing court orders.   As reflected in the PSR, two prior

warrants were issued for the defendant's contempt of court: one in May 2020 and one in June 2020. ECF No. 1105 at 37.   Prior to these instances, the defendant was charged with contempt on June 25, 2009.   *Id.* at 38.

In the instant matter, the defendant was convicted of interfering with law enforcement officers during an unprecedented attack on the United States Capitol, aimed at stopping members of Congress from performing their constitutionally required duty to review and certify the results of the 2020 presidential election.   As the Court noted after the verdict in the related *Rhodes* matter, the seriousness of this offense cannot be overstated.   1/23/23 Tr. at 4769.   "[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy."   *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   The attack was calculated to interfere with, and did interfere with, one of the most important democratic processes we have: the peaceful transfer of power.   As noted by Judge Moss during a different sentencing hearing,

> [D]emocracy requires the cooperation of the governed.   When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.   The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.   It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, No. 21-cr-188, Sent. Tr. at 69-70.   Indeed, as this Court sadly observed in sentencing co-conspirator Rhodes, one of the "enduring legacies of January 6" is that "we all now hold our collective breaths every time an election is approaching."

On January 6, the defendant knowingly joined and took steps towards furthering this devastating attack on our democracy.   The Court must impose a significant sentence of incarceration to reflect their roles in this grave offense.

26

In addition to attacking our democracy itself, the conduct of the defendant and his co-conspirators harmed institutions and individuals alike: the government, Congress, legislators, the staffers working inside the Capitol building, and the hundreds of law enforcement officers from across the region valiantly trying to protect the building, the people, and the constitutional process. The chilling victim impact statements presented to the Court in the related *Rhodes* matter convey the monumental impact of the defendant's offense.   *See* 22-cr-15, 5/24/23 Tr. at 1-32.

Opposing the transfer of presidential power and invading the U.S. Capitol building and grounds also constituted an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8]   As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration.

### b.  The History and Characteristics of the Defendant and His Role in The Offense

The defendant was an early and enthusiastic participant in the charged conspiracy. Immediately following the 2020 Presidential Election, Defendant Crowl articulated an expectation and, indeed, preference for violence.   He wrote to Watkins in advance of the November 14, 2020 event in Washington, D.C. about "nightsticks," adding "Let's party."   He was then photographed at the event with sawed off pool cues, presumably the referenced nightsticks, in Washington, D.C. Gov.  Sentencing Ex. 1.  Later, in advance of January 6, 2021, the defendant wrote Caldwell about 'tifa hunt'in.'"   He did not make these comments to observe what might be possible—he

---

[8] FBI Director Christopher Wray, Statement before House Oversight and Reform Committee (June 15, 2021), *available a*t oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray %20Testimony. pdf

expressed a preference for engaging in and instigating violence.

The defendant was with Watkins when she drove her weapons with Bennie and Sandra Parker.   He was aware of the purpose of these weapons because Caldwell had informed him about preparations for a QRF.   Regardless of his own personal contribution of weapons, on January 6, he dressed in the same combat-ready fatigues as his co-conspirators.   Gov. Ex. 1042.   Not only did he wear a ballistic vest and goggles, but he had on tactical gloves as well.   *Id.*

On January 6, his statements and actions were consistent with this expressed desire for conflict.   While inside the U.S. Capitol, he gloated that he "Overran the Capitol."   Moreover, he was directly behind Watkins as they shoved toward the in-view officers stationed between the mob and the Senate Chamber.   Later, on the evening of January 6, Defendant Crowl described the day as "EPIC!!!" and described himself as part of the "rioters, thugs, and violent"   ECF No. 987, ¶67. Defendant Crowl similarly messaged another Facebook acquaintance, "We will fight." *Id.* ¶68.

In sum, the defendant prepared for, and engaged in, violence to achieve his desired political ends.   His role in the conspiracy, and his commitment to the use of force from its inception, merits a significant period of incarceration.

### c.  Need for the Sentence to Afford Adequate General Deterrence

In this case, significant sentences are needed "to afford adequate deterrence to criminal conduct" by the defendant and others.   18 U.S.C. § 3553(a)(2)(B).   Here, the need to deter others is especially strong because the defendant and his co-conspirators engaged in acts that were intended to influence the government through intimidation or coercion.   Accordingly, their sentences will be noted by those who would join conspiracies to commit such political violence in the future.

#### d.  Need to Avoid Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—a significant sentence of incarceration is demanded because the defendant's participation in this conspiracy and the sentences recently imposed by the Court on some of the defendant's co-conspirators.

The defendant and his co-conspirators stand out among January 6 defendants because they not only joined in this horrific attack on our democracy as it unfolded, but they all took steps, *in advance* of January 6, to call for and prepare for such an attack.   From participating in chats and meetings in which they advocated for the use of force to stop the certification of the election, to transporting weapons across the country to stage around our nation's capital in support of this objective, the defendant intentionally helped to set the stage for January 6.   Thus, other January 6 cases are simply not comparable to the scope and magnitude of the conspiracy that constitutes the relevant conduct for this case.

To avoid unwarranted disparities with his co-conspirators, under Section 3553(a)(6), the defendant should also be sentenced to 30 months of incarceration.   The defendant was not a leader of the conspiracy, but nor was he a minimal participant in the conspiracy and the actions of January 6.   As laid out above, in the Joint Stipulated Facts to which the defendant agreed, the defendant became involved in Oath Keeper operations to challenge the results of the 2020 Presidential Election as early as November 2020.   On November 14, 2020, he and co-conspirator Watkins traveled to Washington, D.C., where they joined an Oath Keeper operation associated with the "Million MAGA March."   During this event, the defendant met co-conspirator Caldwell, with whom he exchanged messages in the weeks that followed about the need to forcibly oppose the

election results.   The defendant also made efforts to attend a training in December 2020 that was hosted by North Carolina Oath Keepers he met at the "Million MAGA" event, although he was ultimately unable to attend.

For January 6, the defendant again traveled to the D.C. area with Watkins and the Parkers, to again be a part of an Oath Keeper operation to oppose the certification of the election.   Evidence introduced in the related trials suggested that this group brought weapons to the D.C. area to contribute to the Oath Keepers' QRF for January 6.   Then, on January 6, the defendant not only joined the "stack" of Oath Keepers who breached the Capitol, but he was part of a smaller group that pushed down the hallway toward the Senate Chamber, against riot police.   While inside the Capitol, he and Watkins filmed a video of themselves bragging about how they "took over the Capitol [and] overran the Capitol."

Defendant Crowl also has no extenuating circumstances, like age or serious medical conditions, that would justify a probationary sentence like the sentences received by Bennie and Sandra Parker and William Isaacs.   He is most similarly situated to co-defendants like Laura Steele and Connie Meggs—active and involved members of the conspiracy and the attack on the Capitol, whom this Court sentenced to 12 months and 15 months of incarceration, respectively. Thus, to ensure consistency with the sentences received by those defendants most similarly situated to him, this Court should sentence the defendant to a significant term of imprisonment.

## IV.    OTHER SENTENCING CONDITIONS

### a.  Restitution

The government respectfully requests that the Court order the Defendant to pay $2,000 in restitution to the Architect of the Capitol.

The defendant's conduct on January 6 affected several entities responsible for the Capitol building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.   In the related *Rhodes* matter, the government filed a brief outlining its factual and legal justification for the apportionment of restitution it has sought in January 6-related cases.   *See* Case No. 22-cr-15, ECF No. 654.   The government hereby incorporates by reference the facts and arguments in that pleading and submits on that record to justify its restitution request for Defendant Crowl.   Should the Court directed the defendant to pay $2,000 as an approximate estimate of the losses for which he is responsible, his restitution payment should be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

**b. Fine**

The government is not recommending that the Court impose a fine on the defendant.

**c. Supervised Release**

The defendant was convicted of a Class C felony.   *See* 18 U.S.C. § 3559(a)(4) (defining offenses like Count Seven, interference with law enforcement officers during a civil disorder, for which the maximum penalty is less than ten years but five or more years of imprisonment, as Class D felonies).   The Court should sentence the defendant to a term of supervised release of three years.   18 U.S.C. § 3583(b)(2); U.S.S.G. §5D1.2(a)(2).

## V.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months of incarceration, followed by three years of supervised release, and an order that the defendant pay $2,000 in restitution to the Architect of the Capitol.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _____/s/_____
Kathryn L. Rakoczy
D.C. Bar No. 994-559
Alexandra S. Hughes
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530